IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____x
CAROL PERRY,                    :    CIVIL ACTION NO.
    Plaintiff,               :    3:01 CV 1828 (CFD)
v.                              :
                             :
DOCTOR'S ASSOCIATES INC.,       :
    Defendant.               :
_____x    OCTOBER 22, 2003

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Pursuant to Local Rule 56(a)(2), plaintiff Carol Perry, through counsel, respectfully submits this statement of material disputed facts in response to defendant's Local Rule 56(a)(1) statement, titled Defendant's Local Rule 9(c)(1) Statement, dated July 30, 2003.[1]

1.        Plaintiff does not dispute the facts set forth in Paragraph 1.

2.        Plaintiff does not dispute the facts set forth in Paragraph 2.

3.        Plaintiff disputes the facts set forth in Paragraph 3 based on information on DAI's website, www.subway.com, stating that DAI employs "close to 600 people at its Milford, Conn., headquarters" and that its franchises "employ more than 150,000 men and women."

4.        Plaintiff does not dispute the facts set forth in Paragraph 4.

---

[1]    All exhibits referenced herein are attached to the Affidavit of Attorney Kathryn Emmett in Support of Plaintiff's Opposition to Summary Judgment dated October 22, 2003.

5.    Plaintiff does not dispute that, at all relevant times, Linda Rizzo was the Director of the Franchisee Services department.

6.    Plaintiff states that the cited testimony does not support that Rizzo supervised between eight and ten Senior Coordinators or supervisors, "evaluating [their] performance and providing them with direction," but does not dispute that these were her *responsibilities*. Plaintiff does not dispute the remainder of the facts set forth in Paragraph 6.

7.    Plaintiff states that the cited testimony does not support that supervisors "monitor and directly address employee conduct" [see Ex. 1 (Perry) at 15 ("Q. While you were a Senior Coordinator, did you review people's performance on your aisle? A. Yes.")], and disputes the suggestion that supervisors, in particular plaintiff, were independently responsible for addressing employee misconduct. Plaintiff was not authorized to issue discipline to the coordinators in her aisle, other than verbally, without permission from Rizzo. See Ex. 1 (Perry) at 87, 156-57, 193-94; see also Def's 9(c) Stmt. at ¶21. Plaintiff also states that the cited testimony does not support, and she disputes, that supervisors, in particular plaintiff, "provide[d] monthly and annual evaluations to the [sic] compensate their subordinates." According to the employee handbook, monthly pay bumps in the amount of $3 were automatic for employees who "perform[ed] an acceptable level of work." See Ex. 11. Employees could also be awarded a "double bump" or a $6 increase for "outstanding" work. See id. Consistent with the handbook, the coordinators in plaintiff's aisle received monthly bumps provided they performed their work [see Ex. 1 (Perry) at 25-28], and plaintiff recommended, and her coworkers received, double bumps, with Rizzo's approval, when they completed extra work – e.g., when one employee was out on leave and

2

others were required to cover the individual's workload. See Ex. 1 (Perry) at 25-28, 43-45, 103.

Plaintiff does not dispute the remainder of the facts set forth in Paragraph 7.

8.      Plaintiff states that the cited testimony does not support all of the facts set forth

in Paragraph 8, but does not dispute the facts. See Ex. 1 (Perry) at 13 (as Senior Coordinator, she

"basically took care of different areas throughout the country, the franchisees, ordering

equipment, sales figures.").

9.      Plaintiff does not dispute the facts set forth in Paragraph 9.

10.     Plaintiff does not dispute the facts set forth in Paragraph 10.

11.     Plaintiff does not dispute the facts set forth in Paragraph 11.

12.     Plaintiff does not dispute the facts set forth in Paragraph 12.

13.     Plaintiff does not dispute the facts set forth in Paragraph 13.

14.     Plaintiff states that the cited evidence does not support that *several* reviews

instructed her "not to 'get frustrated and upset at the little things,'" but does not dispute that her

March 1998 review made this comment. See Ex. 12. See also Ex. 1 (Perry) at 152 ("Q. Did

Linda ever tell you not to get frustrated and upset over little things? A. Yes."). Plaintiff also

does not dispute that she received an evaluation from Rizzo commenting that she should try to

"maintain objectivity when dealing with subordinates" many years prior to the events at issue in

this case, in November 1990. See Ex. 12. Finally, plaintiff does not dispute that Rizzo

instructed her to "ignore" her coworkers' misconduct, including, *inter alia*, their sexual remarks.

See Ex. 2 (Rizzo) at 88 (admitting that, in response to plaintiff's complaint about sexual remarks

coming from people in her aisle, she instructed her to "[j]ust go back and ignore them."). See

also, e.g., Ex. 1 (Perry) at 76 (after plaintiff reported threatening incident involving Diana Rich,

3

Rizzo instructed her "[j]ust go back to your desk, relax, and ignore them."); Ex. 2 (Rizzo) 27

(when plaintiff reported offensive touching by Agnes Buccieri, Rizzo responded "just to ignore it

and tell her to stop"), 147-48; Ex. 14. Plaintiff does not dispute the remainder of the facts set

forth in Paragraph 14.

15.    Plaintiff disputes the facts set forth in Paragraph 15 and states that the cited

testimony does *not* support, but rather directly contradicts, that she "understood that Supervisors

had the authority to take disciplinary actions regarding their subordinates." See Ex. 1 (Perry) at

193-95 ("Q. What authority did you have? A. Basically the only authority I had was I was a

glorified baby-sitter to make sure the work was done. I could recommend, I could write memos,

but the final say was from [Rizzo]. And if some things were done, we were never notified, if

something was done after the fact. Q. Did you ever discuss with Wendy Kopazna, or anyone else

in HR, what exactly your authority as a supervisor was? A. I was under the understanding as far

as authority I didn't really have any. It was basically to make sure the work was produced,

deadlines were met, sales figures were called in, and basically be the messenger to the group,

handing out information.").

16.    Plaintiff does not dispute the facts set forth in Paragraph 16, but states, once

again, that the cited testimony does not support all of the stated facts.

17.    Plaintiff does not dispute the facts set forth in Paragraph 17 and states further that

it was "highly recommended" that she attend the seminar on "hostile employees, or employees

who know it all." Ex. 1 (Perry) at 31. Plaintiff does not dispute that she attended sexual

harassment training, but does not recall when. See id. at 30.

4

18.     Plaintiff does not dispute that an employee evaluation might include "problems with an employee's work-habits and overall attitude," but states that the cited testimony does not support that fact [see Ex. 2 (Rizzo) at 20-22; Ex. 3 (Kopazna) at 128)] and, furthermore, that plaintiff was not authorized to issue discipline to the coordinators in her aisle, other than verbally, without permission from Rizzo and that when plaintiff approached Rizzo about issuing warnings or negative evaluations, she was repeatedly instructed to ignore misconduct or to think about it in order to discourage her from issuing a negative evaluation. See Ex. 1 (Perry) at 87-88, 156-57, 193-94.

19.     As set forth below, plaintiff does not dispute the facts set forth in Paragraph 19, but disputes the suggestion that DAI followed a system of progressive discipline based on the fact, *inter alia*, that Rizzo repeatedly instructed her to ignore misconduct or to think about it in order to discourage her from issuing a negative evaluation [see plaintiff's response to Paragraph 18 *supra*] and to "ignore" her coworkers' harassing behavior [see plaintiff's response to Paragraph 14]. See also Plaintiff's Statement of Facts, generally.

a.     Plaintiff does not dispute the facts set forth in Paragraph 19.a. and states further that even though the company's warning form indicated that verbal warnings should be documented so that progressive discipline could be imposed, it was not the company's practice to document verbal warnings. See e.g., Ex. 21.

b.     Plaintiff does not dispute the facts set forth in Paragraph 19.b., but refers to her response to Paragraph 18 *supra* and states that the company did not require that written warnings be placed in an employee's personnel file. See Ex. 3 (Kopazna) at 12-13.

c.     Plaintiff does not dispute the fact set forth in Paragraph 19.c..

5

20. Plaintiff does not dispute the facts set forth in Paragraph 20.

a. Plaintiff does not dispute the fact set forth in Paragraph 20.a., but disputes any suggestion that bumps were provided on the basis of employee performance other than "perform[ing] an acceptable level of work." See Ex. 11. See also Ex. 1 (Perry) at 25-28.

b. Plaintiff does not dispute that bumps could be withheld for poor performance or disciplinary issues, but disputes the suggestion that supervisors, in particular plaintiff, were authorized to withhold bumps without Rizzo's authorization [see Ex. 1 (Perry) at 27] and refers to her response to Paragraph 18 *supra* and to Defendant's 9(c) Statement at Paragraph 21 ["bump recommendations generated by Supervisors are reviewed and signed off on by FS Director"].

c. Plaintiff does not dispute that coordinators who "demonstrated exceptional performance" could be rewarded with a double bump, but states that, as a supervisor, she could only recommend the double bump and was required to seek Rizzo's authorization to institute the increase. See Ex. 1 (Perry) at 26-28; see also Def's 9(c) Stmt. at ¶21. Plaintiff also states that the cited testimony does not support that "[m]ost employees on the Bump System did not get Double-Bumps." See Ex. 3 (Kopazna) at 24 (indicating that she has no knowledge or recollection of what percentage of employees received double bumps). Plaintiff does not dispute the remainder of the facts set forth in Paragraph 20.c..

21. Plaintiff does not dispute that evaluations, any written reprimands and bump recommendations were required to be signed off on by Rizzo, but states that written reprimands were not required to be forwarded to HR and refers to her response to Paragraphs 18 and 19.b. *supra.*

6

22.    Plaintiff does not dispute the facts set forth in Paragraph 22, but states that Wendy

Kopazna testified that her "best guess" is that the company instituted a formal sexual harassment

policy in the "mid-nineties." Ex. 3 (Kopazna) at 15-16.

23.    Plaintiff does not dispute the facts set forth in Paragraph 23, but states that, in

addition to the quoted language, the 1995 policy instructs employees to report possible sexual

harassment to their supervisor or Department Head first, as follows:

> If you believe you have been subjected to sexual harassment at work by anyone, including
> managers, co-workers, or any outside party dealing with the Company, you should first
> bring the problem to the attention of your Supervisor or Department Head. If you are
> uncomfortable raising your complaint with someone to whom you report, or if your
> complaint involves one of these individuals, then you are urged to bring it to the attention
> of some other management representative or directly to the Personnel Director.

Ex. 11. And the 2000 policy similarly states:

> If you believe you have been subjected to sexual harassment at work by anyone, including
> managers, co-workers, or any outside party dealing with the company, you should first
> bring the problem to the attention of your manager/supervisor. If you are uncomfortable
> raising your complaint with someone to whom you report, or if your complaint involves
> one of these individuals, then you are urged to bring it to the attention of some other
> management representative or directly to the Director of Human Resources.

Id.

24.    Plaintiff does not dispute that the company's sexual harassment policies

represented that complaints of harassment would be promptly investigated, but disputes that the

company, in fact, promptly, or at any time, investigated her complaints of harassment [see

plaintiff's Statement of Facts, generally] and that "[a] finding of harassment" would necessarily

result in disciplinary action. See Ex. 3 (Kopazna) at 29-30 ("Q. Is it company policy that if there

is a finding that harassment occurred, disciplinary action will be taken? . . . A. I don't think it's a

policy. I think it's an understanding and an assumption. Obviously, if we find something is

7

wrong, we will fix it, that usually includes disciplinary action."). Plaintiff notes, furthermore,

that defendant revised its sexual harassment policy, making the disciplinary requirements less

stringent, in January 2000. Whereas the policy that had been adopted in 1995 stated that

"[h]arassment in any form . . . is strictly against Company policy and *will* result in disciplinary

action," the policy, as revised in January 2000, provided only that "[h]arassment . . . *may* result in

disciplinary action . . ." Ex. 11.

      25.    Plaintiff does not dispute the facts set forth in Paragraph 25, but states that some

of plaintiff's coworkers testified that they did not, in fact, review the policy. See Ex. 4

(Benedetto) at 30 (was given copy of company handbooks, but never read them); Ex. 5 (Buccieri)

at 26 (never reviewed sexual harassment policy and no one went over it with her).

      26.    Plaintiff does not dispute the facts set forth in Paragraph 26, in particular, that the

company's sexual harassment policy was distributed to employees, but states that the cited

testimony supports that the policy was available on the company web site at the time of the

depositions only and does not support that it was distributed by newsletter. See Ex. 2 (Rizzo) at

30; Ex. 3 (Kopazna) at 18, 21.

      27.    Plaintiff does not dispute the fact set forth in Paragraph 27.

      28.    Plaintiff does not dispute that she was told to "go to human resources" to report

sexual harassment, but disputes that she was "required" to report harassment to HR and states

that the company's sexual harassment policies specifically instructed employees to report

possible sexual harassment to their supervisor, Department Head or manager first. See Ex. 11;

Paragraph 23 *supra*.

29.    Plaintiff does not dispute the fact set forth in Paragraph 29, but states that she is not certain when Potter (f/k/a Fratarcangeli) was assigned to her aisle.

30.    Plaintiff does not dispute the facts set forth in Paragraph 30.

31.    Plaintiff does not dispute that she asked Potter to put the photo away, but disputes, and states that the cited testimony directly contradicts, that she "assumed that Potter complied because she did not see anyone else with it afterwards." See Ex. 1 (Perry) at 139 ("Q. What happened when you asked [Potter] to put the photograph away? A. The girls wanted to see it, so she passed it down. . . . And they laughed, and I assumed she put it away. Q. Do you have reason to believe that she didn't put it away? A. Yea, because other people knew about it, so I am sure it got passed around."). See also Ex. 14. Perry does not dispute that she had previously warned Potter about the quality of her work and states that she verbally reprimanded Potter by asking her to put the photo away, but did not request approval to issue Potter a written warning from Rizzo because plaintiff had "already given her [the] warning about her work and everything, and [Potter] was just trying to fit in with the aisle" and because the women in plaintiff's aisle gave Potter a difficult time and were "mean to her." See id. at 139-40.

32.    Plaintiff does not dispute the facts set forth in Paragraph 32, but states that she is not certain when Benedetto (n/k/a Krochko) was assigned to her aisle.

33.    Plaintiff does not dispute the majority of the facts set forth in Paragraph 33; however, plaintiff states that the cited evidence does not support that plaintiff recommended, or that Benedetto received, a double bump in July 1997.

34.    Plaintiff does not dispute the facts set forth in Paragraph 34 and states further that Benedetto used other profanities as well. See e.g., Ex. 1 (Perry) at 123 ("She was always

9

swearing, f'ing this, rep bastard, son of a bitch . . ."), Complaint at ¶11 (Benedetto used terms

"assholes" and "fucking bastards"); Ex. 14 (Benedetto called franchisees "assholes," "stupid

bastards," "fucking assholes," and "fucks," asked plaintiff "where the fuck do you think your

[sic] going," asked coworker whether she "swallow[s] when [she] gives a blow job," and called

plaintiff "rat bastard" and "useless bag of shit.").

35.    Plaintiff does not dispute that she instructed Benedetto to take a walk to calm

down when she swore. Plaintiff disputes the suggestion, and states that the cited testimony does

not support, that she swore similar to Benedetto but only less frequently. See Ex. 4 (Benedetto)

at 35 ("Q . . . Before she swore at you, the day she left, had you heard her swear on other

occasions?  A.  Yes, ma'am, maybe just "shit" or something like that, nothing crazy and not all

the time, no.  Q.  And would it be fair to say that she was – she didn't swear?  A.  A lot, yes,

ma'am.").

36.    Plaintiff does not dispute the facts set forth in Paragraph 36, but also states that

they were scheduled to meet with Wendy Kopazna of HR about the problem in January 2000, but

after Kopazna missed the meeting, Rizzo suggested to plaintiff that she would "take care of it

first" instead. Ex. 1 (Perry) at 122. Plaintiff also states that she complained to Rizzo about

Benedetto's swearing on a regular basis and that it was only after many months, in January 2000,

that Rizzo agreed to meet with Benedetto about the problem and that previously Rizzo only

responded that she would "talk" to Benedetto, but the misconduct continued. See Ex. 14; Ex. 2

(Rizzo) at 81-82.

37.    Plaintiff does not dispute the facts set forth in Paragraph 37.

10

38.    Plaintiff does not dispute that she verbally reprimanded Buccieri for misconduct including frequent absences, excessive personal calls and inappropriate touching of coworkers, but disputes, and states that the cited evidence does not support, that she issued a "written reprimand" to Buccieri. See Ex. 21. Plaintiff states that, despite plaintiff's repeated complaints to Rizzo and requests that she issue and/or authorize disciplinary action against Buccieri for her misconduct, Rizzo refused until January 2000, but then finally issued a warning to Buccieri herself while plaintiff was out on disability leave due to the circumstances at work. See Ex. 1 (Perry) at 81-88, 157; Ex. 2 (Rizzo) 147-50; Ex. 21.

39.    Plaintiff does not dispute that Buccieri inappropriately touched Rich. Plaintiff disputes defendant's disingenuous suggestion that there is no evidence to support that she touched others in the aisle, including plaintiff [see Ex. 5 (Buccieri) at 14 ("Q. . . . did you, . . . touch [employees other than Rich] you were working with? A. I gave them a neck massage when they said their neck hurt. Q. Did you ever do that with Carol Perry? A. I don't recall. I might have, but I don't recall."); Ex. 8 (Rich) at 13 ("Q. And were you aware that she touched other people who were working in the aisle? A. Yes. Q. And who else are you aware that she touched? A. Well, that was just her way. It would be anybody."); Ex. 1 (Perry) at 82-83; Ex. 14; Ex. 4 (Benedetto) at 14-15 (Buccieri made coworkers uncomfortable by rubbing their shoulders)] and states, furthermore, that the testimony cited by defendant does not support that point. See Ex. 3 (Kopazna) at 104 (stating only that *she* "didn't hear of [Buccieri] touching anyone but Diana.").

40.    Plaintiff does not dispute the facts set forth in Paragraph 40, but states that she is not certain when Rich was assigned to her aisle.

11

41.    Plaintiff does not dispute the facts set forth in Paragraph 41 and states that she recommended the first double bump for Rich immediately after she was reassigned to plaintiff's aisle because Rich's previous supervisor, Paula Gomez, had been on an extended leave of absence requiring Rich to complete additional work during that time. See Ex. 1 (Perry) at 43-45. Plaintiff recommended the second double bump for Rich, and for the other coordinators in her aisle, when plaintiff was going out on an eight week medical leave in 1999 because they would be required to complete additional work as a result of her absence. See id.

42.    Plaintiff does not dispute that she never issued a written reprimand to Rich and states further that she was not authorized to issue a written reprimand without authorization from Rizzo [see plaintiff's response to Paragraphs 7 and 15 supra) and that she verbally reprimanded Rich, among others, and complained repeatedly to Rizzo about her coworkers' harassment, including harassment by Rich, but that Rizzo took no action, leading plaintiff to believe that her complaints to management were fruitless and that the misconduct was tolerated or even condoned by the company. See plaintiff's Statement of Facts, generally; Ex. 1 (Perry) at 114-15, 153-54, 157-58, 202-3. Furthermore, plaintiff became reluctant to continue complaining to management because, when she did, it only made her coworkers even more hostile and abusive toward her. See id.

43.    Plaintiff disputes that she "never told [her coworkers] that she found the materials objectionable" and states that defendant cites no evidence in support of this point. See Ex. 1 (Perry) at 54-55. Plaintiff states further that Rich brought in not one but several condoms together with the "sex toy" magazine or catalog. See Ex. 1 (Perry) at 50-52; Ex. 14; Ex. 8 (Rich) 15-16 (admitting that she brought sex paraphernalia pamphlet and condoms to work as show and

12

tell and made a joke about how many condoms she was going to come back with after her anniversary trip with her husband); Ex. 7 (Prince) at 55-56 (Rich brought in lingerie catalog and had discussion about condoms); Ex. 6 (Ewaskie) at 13 (confirming that Rich brought "condom catalog" to work). Plaintiff does not dispute the remainder of the facts set forth in Paragraph 43.

44.     Plaintiff disputes, and states that the testimony cited by defendant directly contradicts, that she only told Rizzo about the condom incident "some time afterwards." Rather, the evidence supports that plaintiff told Rizzo the very next day. See Ex. 1 (Perry) at 56-58. See also Ex. 14. Plaintiff also disputes the suggestion that Rizzo testified she was not informed of the incident by plaintiff. Rather, Rizzo testified that she doesn't recall whether plaintiff told her or not. See Ex. 2 (Rizzo) at 122. Plaintiff also disputes, and states that the cited testimony does not support, that she joined in "joking" about the items. Rather, her coworkers claimed only that she "looked" at it. See Ex. 7 (Prince) at 55-56, 59; Ex. 6 (Ewaskie) at 13. Plaintiff does not dispute that she looked at the catalog before realizing what it was, but denies the suggestion that she spent time looking at the magazine or enjoyed it together with her coworkers. See Ex. 1 (Perry) at 53-56. Plaintiff does not dispute that "she found the items personally offensive and inappropriate and did not participate."

45.     Plaintiff does not dispute the facts set forth in the first sentence of Paragraph 45 and states that Buccieri touched other coworkers as well, including plaintiff, on a regular basis. See Ex. 1 (Perry) at 58-59, 82-83; Ex. 14; Ex. 8 (Rich) at 11-13; Ex. 4 (Benedetto) at 14-15; Ex. 5 (Buccieri) at 14. Plaintiff does not dispute that *initially* she did not confront Buccieri directly concerning Rich's complaint, but states that she did instruct Buccieri to stop touching *her* because it made her uncomfortable and that Buccieri just laughed in response, and that when

13

Rich complained about similar behavior that was making her uncomfortable she reported the problem to and requested guidance from HR and was instructed that Rich should tell Buccieri to stop herself or report the problem to HR and that plaintiff should "stay out of it." Compare Ex. 1 (Perry) at 57-60 with Ex. 3 (Kopazna) at 103-4 (plaintiff reported that an employee was uncomfortable with Buccieri touching and Kopazna responded that she would speak with Buccieri, but that "it would help" if she knew who the complaining employee was and Rich then "came down leerily" and "didn't want [Kopazna] to use her name."). Plaintiff does not dispute that, as indicated, after Rich complained to her repeatedly that Buccieri was making her uncomfortable, she reported the problem to HR without initially identifying Rich, but disputes that she did not identify Buccieri *and* the suggestion that Rich was not subsequently identified, and states further that she also reported the problem to Rizzo. See Ex. 1 (Perry) at 59-62, 84-85; Ex. 3 (Kopazna) at 103-4 (claiming that she spoke with both Rich and Buccieri about the problem subsequently); Ex. 2 (Rizzo) at 17-18, 36-38; Ex. 8 (Rich) at 11-12; Ex. 14. Plaintiff disputes that she told Rizzo that "Rich wished to bring sexual harassment charges," and states that she reported the problem to Rizzo, consistent with the company policy stating that she should report possible sexual harassment to management, and that it was then characterized as possible sexual harassment. See Ex. 11; Ex. 1 (Perry) at 61-62; Ex. 2 (Rizzo) at 36 (admitting that unwanted touching could be sexual harassment "if somebody didn't want [] someone to touch them"). Plaintiff does not dispute that Rich subsequently "denied wishing to make any such complaint." See Ex. 2 (Rizzo) at 17 ("[Rich] didn't want to bring the issue up, she didn't want any discipline action taken towards [Buccieri]"). Plaintiff disputes that "Rich *merely* requested that [plaintiff] to keep [sic] Buccieri busy" and states that Rich complained to her

14

"constantly" that Buccieri's behavior was making her uncomfortable and wanted plaintiff to take action to stop the behavior. Compare Ex. 1 (Perry) at 58-59 and Ex. 14 with Ex. 8 (Rich) at 12 ("I brought [Buccieri's behavior] to [plaintiff's] attention that if she would just try to keep her occupied and not to stare at me most of the day because I was starting to become very uncomfortable over the situation."). Plaintiff does not dispute that Rich became angry with her for reporting the problem to management and warned her "don't ever do that again." See Ex. 1 (Perry) at 62; Ex. 14; Ex. 8 (Rich) at 12; Ex. 7 (Prince) at 61. Plaintiff does not dispute that HR dealt with matter as between Rich and Buccieri, but states that Buccieri testified that she was never spoken to about or reprimanded for inappropriate touching and that the manner in which the situation was handled by management led to hostility and retaliation against plaintiff by her coworkers for reporting possible sexual harassment consistent with the company's sexual harassment policy. See Ex. 1 (Perry) at 62-63, 84-85; Ex. 14; Ex. 8 (Rich) at 12; Ex. 7 (Prince) at 61.

46.    Plaintiff does not dispute that she was involved in an incident with Rich on or about January 5, 2000 during which plaintiff told Rich to leave the aisle and Rich refused, but disputes any suggestion that the incident occurred because plaintiff told Rich to leave the aisle. Compare Ex. 1 (Perry) at 66-72 and Ex. 14 (explaining that Rich became angry because two other employees were offered over-time to help another employee who had fallen behind and began yelling at plaintiff claiming that it was "bullshit"and swinging a mug at her in threatening manner and when plaintiff told her to leave aisle, refused) with Ex. 8 (Rich) at 24-25 (claiming that someone else "undertoned" plaintiff, plaintiff thought it was her and ordered her out of aisle, Rich refused, plaintiff "took off," and Rich went to HR). Plaintiff also does not dispute

15

that Rich was "swinging the cup she held," but disputes defendant's suggestion that Rich was not

acting in a threatening manner.  See Ex. 1 (Perry) 67-70; Ex. 14.  Furthermore, plaintiff objects

to defendant's false and disingenuous representation that plaintiff's "characterization of this

incident in her complaint is inconsistent with her later sworn testimony" in that in the complaint

she alleges that Rich swung the mug in a threatening manner but in plaintiff's testimony she

"admits that Rich was speaking with her hands, indicating that the mug was not wielded with

threatening intent."  In fact, plaintiff testified, entirely consistent with the allegation in her

complaint, and clearly that Rich's behavior was threatening in that she was "leaning back

because [she] thought [Rich] was going to hit [her]," that Rich "was talking with her hands, and

she was swinging [the mug]," that she "thought [Rich] was going to hit her with it, so [she]

backed up in [her] seat," and that "if [she] didn't lean back, [she] would have got it across the

cheek."  See Ex. 1 (Perry) at 67-70.  Plaintiff also testified that Rich "[t]otally flipped out" and

was screaming at her at the time.  See id.  Plaintiff does not dispute that Rizzo's assistant, Bonnie

Moger, interceded, and states further that, at that time, plaintiff left and went to HR.  See id.; Ex.

14.

47.    Plaintiff does not dispute the facts set forth in the first sentence of Paragraph 47,

but states that she is not certain when Prince was assigned to her aisle.  Plaintiff does not dispute

that Prince "seldom spoke" to her or that Prince did her work, but states that the cited testimony

does not support that Prince "mainly focus[ed] on her work."  See Ex. 1 (Perry) at 104-5 (stating

that Prince "just about talked to [her]" and "just did her work, and basically her conversations

were basically around [Benedetto]."

48.     Plaintiff does not dispute that she recommended double bumps for Prince in November 1998 and July 1999, writing in 1999 that she was "very pleased" that Prince was a part of her aisle, but states that the cited evidence does not support that plaintiff recommended a double bump for Prince in January 1998 and plaintiff does not recall doing so.  See Ex. 1 (Perry) at 103.  Plaintiff recommended the July 1999 bump for Rich, and for the other coordinators in her aisle, when plaintiff was going out on an eight week medical leave in 1999 because they would be required to complete additional work as a result of her absence.  See Ex. 1 (Perry) at 43-44, 103.

49.     Plaintiff does not dispute the facts set forth in Paragraph 49.

50.     Plaintiff disputes that she never expressed to Prince that such comments bothered her.  See Ex. 1 (Perry) at 108.

51.     Plaintiff does not dispute the facts set forth in Paragraph 51, but states that she was not authorized to issue written reprimands or negative performance evaluations without Rizzo's approval and refers to her response to Paragraphs 7, 15 and 18 *supra*.

52.     Plaintiff does not dispute the facts set forth in Paragraph 52, but states that she is not certain when Ewaskie was assigned to her aisle.

53.     Plaintiff does not dispute that she recommended double bumps for Ewaskie in January 1998, November 1998 and July 1999, or that she recommended the July 1999 bump for Ewaskie, and for the other coordinators in her aisle, when plaintiff was going out on a medical leave because they would be required to complete additional work as a result of her absence.  See Ex. 1 (Perry) at 43-44.  Plaintiff disputes, however, that she was out on leave for 17 months and

17

states her 1999 leave was for approximately 8 weeks and another supervisor, Paula Gomez, took

an approximately 17 week leave.  See id. at 44-45.

54.    Plaintiff disputes the suggestion in Paragraph 54 that Ewaskie was not involved in

the harassing and/or retaliatory misconduct and states that the cited evidence does not support the

facts as stated by defendant, in particular that Ewaskie never did anything "independently

sexually harassing to [plaintiff]."  See Ex. 1 (Perry) at 96-97; Ex. 14.  Rather, plaintiff testified

only that Ewaskie generally would not initiate the misconduct.  See Ex. 1 (Perry) at 96-97 ("Q.

Did you ever feel that Sharon Ewaskie sexually harassed you?  A.  She would, once a

conversation would get going, she would get in there with the group, but she never – she never

really started it.  But once it was started, she would jump in with some remarks. . . . Like if they

were talking about certain things like the incident with [Rich] bringing in [the condoms and sex

toy catalog]. . . .  Basically if they were talking about their husbands and stuff like that, she

would get into the conversation.  She would tease me if I came in and I was smiling, that I must

have got [sex] the night before.").

55.    Plaintiff does not dispute that she never issued Ewaskie a written reprimand or

negative performance evaluation, but states further that she was not authorized to take such

action without Rizzo's approval and refers to her response to Paragraphs 7, 15 and 18 supra.

56.    Plaintiff does not dispute the facts set forth in Paragraph 56.

57.    Plaintiff does not dispute that Youngblood interrupted her while she was meeting

with her coworkers and states further that Youngblood was "furious" because the system of a

terminated employee had not been "closed out."  See Ex. 1 (Perry) at 127-28; Ex. 14.  Plaintiff

does not dispute that she "objected" to the interruption in that she told Youngblood that she was

18

"in the middle of a meeting" and would close out the system when she finished. See id. Plaintiff

does not dispute that the incident was witnessed by coworkers or that she recalls that

Youngblood called her "fucking asshole" or said or gestured to plaintiff "to kiss [her] ass" and

that others testified that their recollection is that Youngblood "tapped her buttocks before

walking away." Compare Ex. 1 (Perry) at 62-64, 127-28 and Ex. 14 (plaintiff's

contemporaneous notes state: "I was having a meeting with the aisle . . . and [Youngblood] came

to my aisle and in front of everyone called me a asshole and to stop what I was doing and close

out. I went to her and said what is the problem and to now [sic] talk to me that way again in front

of everyone. She told me you're Fuckin ass hole out loud. I said why are you talking to me like

this and she said get away from me I am very angry at you. Everyone in aisle heard her.") with

Ex. 9 (Youngblood) at 12-19 (admitting only that she interrupted plaintiff during meeting and,

when plaintiff objected, she hit her rear end with her hand); Ex. 8 (Rich) at 20-21 (stating that

she doesn't recall exactly what happened but that Youngblood "abruptly interrupted" and "words

were passed" and admitting that Youngblood said something like "kiss my ass" or made gesture);

and Ex. 4 (Benedetto) at 20 (Youngblood "tapped her butt and walked out of the aisle.").

58.      Plaintiff does not dispute that she complained to Rizzo about the incident and

states further that she also informed Rizzo about other incidents involving Youngblood at that

time and Rizzo indicated she planned to speak with Youngblood because she acted

inappropriately toward others as well. See Ex. 1 (Perry) at 129-31; Ex. 14. Plaintiff does not

dispute that she initially asked Rizzo not to discuss the matter with Youngblood because Rizzo

indicated and plaintiff feared that Youngblood would retaliate against her for complaining. See

Ex. 14; Ex. 1 (Perry) at 130-31. Plaintiff does not dispute that Rizzo met with Youngblood about

19

the misconduct and told her, according to Rizzo, "[w]ell, you know, you can't talk to people that way, you have to treat them professionally," and states further that, according to Rizzo, she only spoke with Youngblood, did not investigate the matter further in an effort to corroborate plaintiff's allegation and did not issue a written reprimand even though Youngblood had a history of behaving inappropriately including in an intimidating manner toward other employees. See Ex. 2 (Rizzo) at 107-21; Ex. 26. Rizzo also did not document any "verbal warning" to Youngblood, even though the company's warning form indicated that verbal warnings should be documented so that progressive discipline could be imposed. See e.g., Ex. 21.

59.     Plaintiff does not dispute the facts set forth in Paragraph 59 and states further that, at the time she wrote the card in February 2000, she was desperate to put an end to the hostile and abusive behavior and knew that management was not going to take any action to correct the situation and wrote the card to her coworkers apologizing for her behavior, letting them know that she was "very proud of each and everyone of [them]" and asking that they "forgive [her] and maybe like [her] just a little again." Ex. 27. See also Ex. 1 (Perry) at 150 ("I was having such a rough time trying to deal with the situation, I even wrote a little thank you to them asking them if they could, you know, I told them I've been under - I don't know the exact words – and if they could just, you know, maybe like me again, we can work things out. I was so desperate, I was willing to do anything.").

60.     Plaintiff disputes that she never "[gave] any of her subordinates any indication that their language and talk made her uncomfortable." See Ex. 8 (Rich) at 19, 22, 32, 48 (plaintiff asked them to "tone it down" and "watch the topics of conversation"); Ex. 7 (Prince) at 42-44, 49 (plaintiff asked them to keep it down and not to use the term "rat bastard"); Ex. 6

20

(Ewaskie) at 11-12 (plaintiff asked them to watch their topics of conversation); Ex. 4 (Benedetto) at 15, 24 (plaintiff asked them to stop swearing but they continued); Ex. 9 (Youngblood) at 19 (everyone knew plaintiff was offended by inappropriate language in aisle).Ex. 9 (Youngblood) at 14 (plaintiff "could have worn a path" to Linda Rizzo's office and was "too busy complaining all the time"). See also Ex. 1 (Perry) at 54-56, 97-98, 104-108, 113, 116; Ex. 14.

61.     Plaintiff disputes that she claimed that Tucker was "ordering a blower" and states that Tucker received a call "about a part that was needed for a piece of equipment for a franchisee," and "[s]he wasn't quite sure what it was and she just turned around and asked and said, It's something about a blower . . ." Ex 1 (Perry) at 112-13. See also Ex. 14. Plaintiff does not dispute the remainder of the facts set forth in Paragraph 61.

62.     Plaintiff disputes, and states that the testimony cited by defendant directly contradicts, that she did not reprimand Benedetto and Prince for the offensive comments. See Ex. 1 (Perry) at 113- 116 ("Q. Now, what did you tell them to do when they were making these comments?  A.  Knock it off ladies, tone it down . . .") Plaintiff disputes that she did not communicate to Benedetto and Prince that she found the comments "personally offensive"and refers to her response to Paragraph 60. Plaintiff does not dispute that she did not report this incident to Rizzo and states further that, based on Rizzo's failure to address her prior complaints, plaintiff did not believe that any action would be taken in response and that it would only make her coworkers more hostile and abusive toward her. See Ex. 1 (Perry) at 114-15 ("Q.  Did you report this incident to Linda Rizzo.  A.  No.  Q.  Why not?  A.  Because at that point of the game, I couldn't handle anymore stress from these people.  I was not able to sleep.  I was having problems just trying to stay at work.  And it was like the more I went to Linda Rizzo, they would

21

find out, and they would just make my life miserable. And it got to the point where I was afraid

to even come to work. Q. What did you anticipate would happen if you didn't report these

incidents? A. I just felt that it wasn't going to get me anywhere. Q. . . . What did you believe

would happen in your aisle if you continued not to report these incidents? A. That maybe they

would stop doing what they were doing. Q. Why did you have that impression? A. I thought

maybe I was coming down too hard on them, and maybe if I backed off, since nothing would be

done about it. Q. Why did you believe that nothing would be done about it? A. Because

whenever I went to Linda Rizzo, it's always been the same thing, Ignore it, brush it off, I will

take care of it. And it just goes on and on and on. It takes forever to convince her to write

somebody up, and at this stage of the game, I was burnt out.").

63.    Plaintiff does not dispute the facts set forth in Paragraph 63.

64.    Plaintiff does not dispute that she does not believe that Prince, Rich, Ewaskie or

Benedetto were sexually attracted to her, but states that the cited testimony does not support that

she does not believe that Buccieri was sexually attracted to her, and she does not know whether

she was. See Ex. 1 (Perry) at 83. Plaintiff does not dispute that she does not believe that

Ewaskie was "motivated by animus to her as a female supervisor," but states that the cited

testimony does not support that she does not believe that Prince, Rich, Benedetto or Buccieri

were motivated by such animus, and she does not know whether they were. See Ex. 1 (Perry) at

49-50, 66, 110-11, 125.    Plaintiff does not dispute that she believes that her coworkers disliked

her, *inter alia*, for reasons unrelated to her sex – in particular, that Prince disliked her, *inter alia*,

because of her relative affluence and that Rich disliked, *inter alia*, because she believed she was

an ineffectual supervisor. See Ex. 1 (Perry) at 49, 66, 111. Plaintiff disputes that she believes

22

that they would have conducted themselves in the same overall manner with any person in a supervisory position over them and states the cited testimony does not support that point. <u>See</u> Ex. 1 (Perry) at 125. Plaintiff states further, contrary to the defendants' implication, that she believes and the evidence shows that her coworkers's hostility toward her was motivated by sex. <u>See</u> Ex. 1 (Perry) at 55 (plaintiff believes that "[a]ttitudes were formed" after plaintiff asked her coworkers to "tone it down"), 91, 94, 106-7 (believes that the harassment "all stemmed because of me mentioning it to them that we should watch out topics of conversation."), 116 (believes coworkers made comments because they knew it was upsetting to her), 124-25; Ex. 8 (Rich) at 31-32, 41 (admitting plaintiff became "very anxious" at some point after all four women joined her aisle and was very upset about what was going on in aisle).

65.     Plaintiff disputes that "[s]everal witnesses testified that [she] went to great lengths to try to ingratiate herself with her subordinates," but does not dispute, as cited by defendant in support of that point, that Kopazna testified that plaintiff wanted to be "well liked by her direct reports" and that Ewaskie testified that she wanted to be "friends" with her coworkers. <u>See</u> Ex. 3 (Kopazna) at 54; Ex. 6 (Ewaskie) at 8, 24-25. Prince testified that plaintiff "wanted to be like a girlfriend instead of a supervisor." Ex. 7 (Prince) at 35. Plaintiff disputes the suggestion that she personally sent Youngblood flowers after the incident when Youngblood called her an "asshole," and states that plaintiff arranged to have flowers sent to Youngblood from her aisle for Secretary's Day. <u>See</u> Ex. 1 (Perry) at 134. Plaintiff does not dispute that, over her years as a supervisor at DAI, she tried to do nice things for the coworkers in her aisle on occasion including, for example, bringing in doughnuts for breakfast. <u>See</u> Ex. 1 (Perry) at 19-20.

23

66.    Plaintiff does not dispute that she gave a coworker a bustier as a bridal shower gift sometime prior to 1993, but the disputes the implication that it was improper. Plaintiff notes that bustiers are corsets, typically worn by brides under their wedding gowns, often in combination with garters to hold up stockings, and, of necessity, are not closed at the crotch so that the wearer is able to use the bathroom. See Ex. 33.

67.    Plaintiff does not dispute that one witness, Debbie Prince, testified that she had "outbursts" at work, or that two witnesses, Agnes Buccieri and Jane Youngblood, testified that, in their opinion, she was "moody." See Ex. 7 (Prince) at 23, 66; Ex. 5 (Buccieri) at 17, 27; Ex. 9 (Youngblood) at 9, 11, 22. Plaintiff disputes that "[her] mood would dictate the working environment," but does not dispute that Buccieri testified that that was her opinion. See Ex. 5 (Buccieri) at 17, 27. Rather, plaintiff states that her "mood" was dictated by, and she suffered emotional distress as a result of, the harassment, abuse and hostility inflicted by her coworkers. See Ex. 1 (Perry) at 175-78; Exs. 28, 32.

68.    Plaintiff does not dispute that facts set forth in Paragraph 68, but states further that the women made the complaint the day after plaintiff complained to Rizzo that Rich had behaved in a threatening manner toward plaintiff. See Ex. 1 (Perry) at 74-76; Ex. 14.

69.    Plaintiff does not dispute that she told Rizzo that she was on medication and would be fine, but disputes defendant's suggestion that she had some unrelated medical or emotional condition and states that she informed Rizzo that she was on medication to treat the stress she was experiencing as a result of the environment at work. See Ex. 2 (Rizzo) at 54-56; Exs. 29, 32.

70.    Plaintiff does not dispute the fact set forth in Paragraph 70 and states that Rizzo

admitted that plaintiff went to her "on a number of occasions and would say []: They're vicious,

they're out of control." Ex. 2 (Rizzo) at 44.

71.    Plaintiff disputes the suggestion that she never identified the individuals about

whom she was complaining to Rizzo.  See e.g., Ex. 2 (Rizzo) at 37-38 (admitting that plaintiff

complained of offensive touching by Buccieri), 81 (plaintiff complained about Benedetto

swearing in the aisle several times), 88 (admitting that plaintiff told her that the women in the

aisle were making sexual remarks and that she told her just to ignore them), 53-54, 93-97

(admitting knowledge about threatening incident involving Rich); Ex. 14; Ex. 1 (Perry) at 56

(plaintiff told Rizzo about sexual comments by Rich), 70 (plaintiff complained about threatening

conduct by Rich and requested that Rich be removed from her aisle); Defendant's Local Rule

9(c)(1) Statement at ¶58 (admitting that plaintiff informed Rizzo that Youngblood had called her

an "asshole" in front of coworkers), ¶78 (claiming that plaintiff "finally identified the 'girls' she

was having problems with" on January 7, 2000).  Plaintiff states that on *some occasions* she did

not provide names to Rizzo because no action was taken to correct the situation and plaintiff only

suffered further retaliation by her coworkers as a result.  See Ex. 1 (Perry) at 34, 38 (Rizzo told

her repeatedly "just document" it), 56 (when plaintiff told Rizzo about sexual comments by Rich,

Rizzo "just shook her head"), 70 (after plaintiff complained to Rizzo about threatening conduct

by Rich and requested that Rich be removed from her aisle – Rizzo responded "[j]ust let it blow

over, try to ignore it, try not to get yourself upset"), 84 (when plaintiff reported Buccieri

touching, Rizzo responded that her husband probably didn't give her enough attention at home

and "just [] ignore it and tell her to stop"), 147-48 (plaintiff complained to Rizzo constantly and

25

her response was "just try to calm down and ignore it, or say something to them, which [plaintiff] would do, and [they] would end up with another problem" and when she informed Rizzo that they ignored her admonitions, Rizzo responded "Try to just calm down, do your work, go back to your desk and try to ignore them."). See also Ex. 1 (Perry) at 114-115, 153-54, 157-58, 202-3. Finally, plaintiff disputes defendant's statement that she did not identify her harassers because she "didn't want to get anybody in trouble" and states that defendant misrepresents her testimony. In fact, plaintiff testified only that, although she had complained to HR about the circumstances in the aisle, *she did not provide HR with her contemporaneous notes* because she did not want to get Rizzo in trouble. See Ex. 1 (Perry) at 39.

72.     Plaintiff disputes that Rizzo instructed plaintiff to "handle her subordinates with the tools available to her" and states that her understanding, as reinforced by Rizzo, was that the only "tool" available to her, absent Rizzo's authorization, was to verbally reprimand her coworkers and refers to her response to Paragraphs 7, 15 and 18 *supra*. Plaintiff also disputes that Rizzo instructed her to "provide specific names and misconduct so that Rizzo could address the misconduct" and refers to her response to Paragraph 71 *supra* and 74 *infra*.

73.     Plaintiff does not dispute that Rizzo testified to the facts set forth in Paragraph 73, but notes that although Rizzo's visits may have been unannounced they were not secret or unobserved by the workers in plaintiff's aisle.

74.     Plaintiff does not dispute that Rizzo told plaintiff to "document it" on several occasions in response to plaintiff's complaints, or that Rizzo *testified* that she made the request so that plaintiff "could provide her with specific allegations of misconduct that she could then discuss and address." Plaintiff also does not dispute that she took copious notes of the events at

26

work, but did not show them to Rizzo, and states that the reason she did not share them is that Rizzo did not ask to see them. See Ex. 2 (Rizzo) at 46 ("Q. And did you ever ask her if she ever wrote down what was happening? A. No, I would assume she would bring it to me if she had something."). Plaintiff did *not* understand, based on Rizzo's comments, that Rizzo wanted to see the notes. In fact, Rizzo's repeated comments of just "document it" and "relax" and "ignore it," led plaintiff to believe that Rizzo was not really interested in learning any more specifics, but was just telling plaintiff to document it to brush her off. See Ex. 1 (Perry) at 38 ("Q. When did [Rizzo] ask you to [take the notes]? A. Whenever I had a problem and went to her about it, she would tell me to document it. . . . Q. If Linda Rizzo instructed you to document events, why didn't you show the documented events to her? A. Because she would just say, Document it. I asked her if she wanted to see one, and she said, Just document them."), 154 ("Q. If you felt as though [Rizzo] didn't believe what you were telling her, why didn't you show her your notes? A. . . . I don't know why I didn't show her the notes. She didn't ask me for them, maybe that is why. She would just tell me to document it, document it. Q. Why did you believe she was asking you to document it if she didn't want to see it? . . . A. I don't know. She would just tell me, Document it, and I just did what I was told."); see also plaintiff's response to Paragraphs 14 and 71 *supra*.

75.     Plaintiff does not dispute that Kopazna testified that she believed that plaintiff "felt her employees were mean to her, not including her in things" and that plaintiff "didn't want to be a mean supervisor," but disputes that she made these statements to Kopazna and also that she "would not provide names or specific details of misconduct to Kopazna." Rather, plaintiff only recalls meeting with someone in HR concerning problems in the aisle on a limited number

of occasions and reported and/or discussed specific information each time – *e.g.*, concerning

Buccieri's inappropriate touching, when Rich acted in a threatening manner towards plaintiff,

and, in January 2000, in order to discuss the possibility of splitting up Rich, Prince, Ewaskie and

Benedetto. See Ex. 1 (Perry) at 59-60, 70, 166-68; Ex. 14. Plaintiff states, furthermore, that she

intended to go to HR to discuss other issues, but was told not to by Rizzo, who said that she

would handle the problems instead [see Ex. 1 (Perry) at 84, 122] and that, initially, she believed

that Rizzo *would* handle the problems and was concerned about going "over [her] director's

head" to HR because she thought it would only make the situation worse; when the

circumstances became unbearable and she met with both Rizzo and HR about the possibility of

splitting up the four women on January 7, 2000, plaintiff understood that HR knew about the

problem, but that Rizzo had the "final say" about what action would be taken in response, and

that Rizzo was not willing to correct the situation. See Ex. 1 (Perry) at 38, 115, 158-59, 167-68,

203-204 ("Because when I did go to HR, it showed that Linda Rizzo had the final say. Wendy

[Kopazna] tried to help the situation, and Linda Rizzo said, No. So, apparently, human resources

would have referred me right back to her."). Finally, plaintiff states that although HR *was* aware

that plaintiff's health was being threatened and that she was required to take disability leave on

two occasions as a result of the circumstances at work, HR took no action to investigate what

was occurring in the aisle. See Ex. 3 (Kopazna) at 83-100; Exs. 17 and 18.

      76.     Plaintiff disputes defendant's claim that Kopazna testified that the only

misconduct plaintiff provided to support that her coworkers were "mean" is that they "did not say

hello to her that morning" and states that Kopazna only used that as an example of her

impression that plaintiff was "supersensitive" and wasn't even sure whether it had actually

happened. See Ex. 3 (Kopazna) at 69. Plaintiff disputes that Kopazna "pressed" her "to provide examples of misconduct" or stated "[y]ou got to help me help you," and refers to her response to Paragraph 75 *supra*. Plaintiff does not dispute that Kopazna may have commented "[y]ou're not here to be their friends, you're their supervisor" at the January 7, 2000 meeting.

77.    Plaintiff disputes that the facts set forth in the first three sentences of Paragraph 77 and refers to her response to Paragraph 75 and states, furthermore, that management had sufficient information to investigate her complaints and/or take remedial action. See plaintiff's response to Paragraph 71 *supra*. Plaintiff does not dispute that Kopazna testified that she and Rizzo "conferred" and "looked into a lot of things and talked to people," but states that the evidence in this case does not support and, in fact, directly contradicts Kopazna's suggestion that plaintiff's complaints were investigated by management. See Ex. 3 (Kopazna) at 57-58, Ex. 2 (Rizzo) at 70-71 (plaintiff "never gave me anything to investigate"), 73-76 (did not investigate plaintiff's complaints to determine whether there was any factual basis even after receiving copies of her contemporaneous notes), Ex. 8 (Rich) at 40 (never spoken to about plaintiff's complaints to management); Ex. 7 (Prince) at 63 (same); Ex. 4 (Benedetto) at 19 (same); Ex. 5 (Buccieri) at 13-14, 24 (management never spoke to her about offensive touching and never asked her about situation in aisle).

78.    Plaintiff disputes, and states that the cited testimony does not support, that she did not identify the women who were harassing her until January 7, 2000 and refers to her response to Paragraph 71. Plaintiff does not dispute that she met with Rizzo and Kopazna that day and pleaded that the four women be split up and that they discussed her options. See Ex. 1 (Perry) at 153, 166-68; Ex. 3 (Kopazna) at 73-74. Plaintiff disputes that Rizzo *could* not split up the four

29

women and states that Rizzo refused, claiming at the time that it "wasn't practical," even though there were spaces available in other aisles [see Ex. 13] and Human Resources was amenable. See Ex. 3 (Kopazna) at 73-76 (plaintiff requested that women be split up and Kopazna didn't see a "huge problem with it," but Rizzo refused claiming it "wasn't practical"); Ex. 2 (Rizzo) at 68-70 (in response to plaintiff's request to split women up, told her that she can't move employees around when they work well together and are getting their work done); Ex. 1 (Perry) at 153-54, 167 (when she asked Rizzo to split up aisle, her response was that she had nowhere to put them). Plaintiff states, furthermore, that even though Rizzo claimed that it was not "practical" to split up the women, immediately after plaintiff resigned because she could no longer tolerate working in such a hostile environment, the women were, in fact, split up and have not worked together since. See Ex. 7 (Prince) at 21; Ex. 3 (Kopazna) at 76-77. Finally, plaintiff disputes that if the four women had been split up that she would necessarily have had an "insufficient number of subordinates to supervise" and states that defendant's claim is disingenuous and illogical. Only three of the four women had to be removed from the aisle in order to "split" them up, but this option was never considered by Rizzo, and, regardless, other workers could easily have been assigned to plaintiff's aisle just as these four women had been assigned to plaintiff's aisle previously. See Ex. 2 (Rizzo) at 69-70, 125-26; Ex. 13.

79.    Plaintiff disputes that Rizzo and Kopazna suggested that plaintiff consider the three stated options at the meeting. Rather, as testified to by Rizzo, plaintiff was offered three options: 1) remain in her position under the same circumstances, 2) resign as supervisor, or 3) resign her employment. See Ex. 2 (Rizzo) at 123-24 ("I told [plaintiff] we had, came up with three options. You can, one, continue to be a supervisor in the aisle where you are now; number

two, become a coordinator in another aisle, or number three, quit, which she wanted to do."); Ex.

1 (Perry) at 167-68.  It was initially discussed that plaintiff could supervise a different aisle

because its supervisor was planning to retire, but that option was quickly rescinded on the basis

that the other supervisor decided not to retire after all, and plaintiff was not offered a transfer or a

"position in another department." Compare id. with Ex. 3 (Kopazna) at 70-71 (claiming transfer

was an option).

80.     Plaintiff does not dispute that Rizzo told plaintiff to "seriously think about"

whether she wanted to resign her supervisory position. See Ex. 1 (Perry) at 168-69.  Plaintiff

disputes that she was "assured" that her pay would not be decreased if she resigned her

supervisory position and states that she was told that the company *could possibly* maintain her

current rate of pay and states further that, if she chose that option, she would have taken a

demotion and would have been back on the "bump" system, which most likely would have

negatively impacted her future earnings. See id.; Ex. 14; Ex. 2 (Rizzo) at 124-25.  Plaintiff

disputes that she was offered a transfer or a "position in another department" and refers to her

response to Paragraph 79.

81.     Plaintiff does not dispute that she was willing to resign her supervisory position at

that point in an effort to end the harassment, but disputes that she was "agreeable" to the idea.

See Ex. 2 (Perry) at 115, 167; Ex. 3 (Kopazna) at 71-72 ("It appeared to me she did not want to

lose the status of being supervisor.").  Plaintiff does not dispute that she decided not to resign her

supervisory position at that time rather than taking one of the two other options that were offered

to her at the January 7, 2000 meeting – *i.e.*, resigning as supervisor and, thus, taking a demotion

or resigning her employment -- and refers to her response to Paragraph 79.

31

82.    Plaintiff does not dispute that she found a note stuck to her computer containing words to the effect of those set forth in the first sentence of Paragraph 82 or that she did not take the note with her to show to Rizzo, but rather left the aisle immediately, went to Rizzo's office and wrote "I quit" on a sticky note because Rizzo was on the telephone at the time and then went to HR and informed Kopazna that she "[couldn't] do this anymore" and was leaving. See Ex. 1 (Perry) at 162-63; Ex. 14. Plaintiff disputes that she returned to the aisle and shouted "Fuck off, Jackie, I quit" or "Fuck you, Jackie, I quit" and states that, when plaintiff returned to the aisle and Benedetto asked "where the fuck" she thought she was going, plaintiff told her to "take the job and stick it up her ass" or words to that effect and may have used the word "fuck." See Ex. 14; Ex. 1 (Perry) at 164.

83.    Plaintiff disputes that "no one has seen this note other than [plaintiff]" and states that the testimony cited by defendant completely fails to support that point or that "[n]o one was seen approaching [plaintiff's] desk the morning of February 24, 2000." See Ex 2 (Rizzo) at 131-32 (doesn't recall anything about a note); Ex. 8 (Rich) at 31 (denying that she was aware of the note), 79 (transcript ends at page 54); Ex. 7 (Prince) at 30 (unrelated testimony).

84.    Plaintiff does not dispute the facts set forth in Paragraph 84.

85.    Plaintiff states that the cited testimony does not support that Rizzo has not received any complaints regarding Prince, Benedetto, Rich or Ewaskie since plaintiff's departure. See Ex. 2 (Rizzo) at 127 (unrelated testimony). Plaintiff does not dispute the remainder of the facts set forth in Paragraph 85.

THE PLAINTIFF, CAROL PERRY

BY: _____
KATHRYN EMMETT
Federal Bar No. ct05605
CHRISTINE CAULFIELD
Federal Bar No. ct19115
Emmett & Glander
45 Franklin Street
Stamford, CT  06901
(203) 324-7744

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, via federal express, postage prepaid, this 22nd day of October, 2003, to:

Kristin Corcoran, Esq.
Kenneth M. Ludovico, Jr., Esq.
Doctor's Associates Inc.
325 Bic Drive
Milford, CT  06460.3059

_____
Kathryn Emmett

34

In addition to the above-referenced facts disputed by plaintiff, plaintiff states that the following facts are in dispute in this case, as set forth more fully in plaintiff's memorandum in opposition to summary judgment:

1.      Whether plaintiff's coworkers subjected her to a hostile and abusive working environment on the basis of sex because plaintiff, as a woman, was offended by their crude language and behavior and, therefore, according her female coworkers, was too stereotypically feminine in that she was too sensitive, "ladylike," moody, emotional or even emotionally unstable.

2.      Whether the harassment in this case was sufficiently "severe or pervasive" to alter the conditions of plaintiff's employment and create and abusive work environment;

3.      Whether defendant failed to provide an "adequate avenue for complaints" or "knew of the harassment, or in the exercise of reasonable care should have known, yet failed to take appropriate remedial action";

4.      Whether plaintiff suffered "an adverse employment action" in retaliation for her complaints of harassment;

5.      Whether defendant's conduct was "extreme and outrageous";

6.      Whether defendant knew or should have known that its conduct during the termination process would cause plaintiff emotional distress;

7.      Whether defendant engaged in intentional discrimination with "malice" or "reckless indifference" to plaintiff's federally protected rights.

33