IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

United States District Court
District of Connecticut
FILED AT     HARTFORD

12/3     20 03
Kevin F. Rowe, Clerk

Deputy Clerk

———————————————————————x
CAROL PERRY,                          :     CIVIL ACTION NO.
    Plaintiff,                      :     3:01 CV 1828 (CFD)
v.                                    :

DOCTOR'S ASSOCIATES INC.,            :
    Defendant.                      :
———————————————————————x     OCTOBER 22, 2003


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... i

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 4

III.  ARGUMENT .......................................................................................................... 18

      A.    STANDARDS ............................................................................................... 18

      B.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON
            PLAINTIFF'S CLAIMS OF SEXUAL HARASSMENT ........................... 19

            1.    Plaintiff was subjected to harassment because of sex. ................ 19

            2.    The harassment in this case was sufficiently severe and pervasive to
                  amount to an actionable hostile work environment. ..................... 24

            3.    Defendant is liable for coworker harassment in this case. ........... 28

                  a.    Plaintiff's complaints and defendant's initial failure
                        to respond ............................................................................ 30

                  b.    Defendant's failure to follow its own sexual harassment
                        policy ................................................................................... 34

                  c.    Defendant's adverse and retaliatory response in
                        January 2000 ........................................................................ 36

      C.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON
            PLAINTIFF'S CLAIMS FOR RETALIATION ........................................ 39

      D.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON
            PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF
            EMOTIONAL DISTRESS ........................................................................... 45

      E.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON
            PLAINTIFF'S CLAIM FOR NEGLIGENT INFLICTION OF
            EMOTIONAL DISTRESS ........................................................................... 47

      F.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON
            PLAINTIFF'S CLAIMS FOR COMPENSATORY AND PUNITIVE

DAMAGES ............................................................................................ 49

IV.   CONCLUSION ................................................................................... 53

## TABLE OF AUTHORITIES

**Federal Cases**

Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Baty v. Willamette Industries, 172 F.3d 1232 (10th Cir. 1999), *overruled on other grounds by* Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002) . . . . . . . . . . . . . . . . . . . . 35

Bianchi v. City of Philadelphia, 183 F.Supp.2d 726 (E.D.Pa. 2002) . . . . . . . . . . . . . . . . . . . . 21

Bibby v. Philadelphia Coca Cola Bottling Company, 260 F.3d 257 (3d Cir. 2001) . . . . . . . . . 21

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Castaneda v. Partida, 430 U.S. 482 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Chambers v. TRM Copy Centers Corp., 43 F.3d 29 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 19, 24

Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81 (2d Cir. 1996) . . . . . . . . . . 42

Collins v. Illinois, 830 F.2d 692 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

Colter v. Yale University, 2000 WL 559023 (D.Conn., Mar. 24, 2000) . . . . . . . . . . . . . . . . . . 42

Cronin v. Aetna Life Insurance Company, 46 F.3d 196 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . 24

Cruz v. New York City Human Resources Admin. & Dep't of Social Servs., 82 F.3d 16 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Distasio v. Perkin Elmer Corporation, 157 F.3d 55 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 19, 23, 25, 30, 34

Dobrich v. General Dynamics Corp., 106 F.Supp.2d 386 (D.Conn. 2000) . . . . . . . . . . . . . . . . 27, 30, 34, 39

Dobrich v. General Dynamics Corp., 40 F.Supp.2d 90 (D.Conn. 1999) . . . . . . . . . . . . . . . . 19

Doe v. City of Belleville, 119 F.3d 563 (7th Cir. 1997), *vacated and remanded for reconsideration in light of* Oncale, 523 U.S. 1001 (1998) . . . . . . . . . . . . . . . . . . . . . 22

Dortz v. City of New York, 904 F.Supp. 127 (S.D.N.Y. 1995) . . . . . . . . . . . 24, 26, 32, 35-37

Downing v. West Haven Board of Ed., 162 F.Supp.2d 19 (D.Conn. 2001) . . . . . . . . . . . . . 42

Ericson v. City of Meriden, 205 F.R.D. 75 (D.Conn. 2001) . . . . . . . . . . . . . . . . . . . . . 41

Farias v. Instructional Systems, Inc., 259 F.3d 91 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 51

Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 41

Gunnell v. Utah Valley State College, 152 F.3d 1253 (10th Cir. 1998) . . . . . . . . . . . . . . . 41

Gupta v. City of Norwalk, 221 F.Supp.2d 282 (D.Conn. 2002) . . . . . . . . . . . . . . . . . . . 48

Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107 (3d Cir. 1996) . . . . . . . . . . . 44

Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . 27

Heller v. Columbia Edgewater Country Club, 195 F.Supp.2d 1212 (D.Oregon 2002) . . . . 21, 28

Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252 (1st Cir. 1999) . . . . . . . . . . . . . 21

International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977) . . . . . . . . . . . 50

Kerzer v. Kingly Manufacturing, 156 F.3d 396 (2d Cir. 1998) . . . . . . . . . . . . . . . 19, 23

Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . 43

Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177 (10th Cir. 1999) . . . . . . . . . . . . . . . . 53

Knox v. State of Indiana, 93 F.3d 1327 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 33, 41

Kolstad v. American Dental Association, 527 U.S. 526 (1999) . . . . . . . . . . . . . . . . . . . 51

Kotcher v. Rosa and Sullivan Appliance Center, 957 F.2d 59 (2d Cir. 1992)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35

Newtown v. Shell Oil Company, 52 F.Supp.2d 366 (D.Conn. 1999) . . . . . . . . . . . . . . . . . . . 28

Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864 (9th Cir. 2001) . . . . . 21, 27, 28, 38

Oncale v. Sundowner Offshore Services, Incorporated, 523 U.S. 75 (1998) . . . . . . . . . . . 20, 22

Parrish v. Sollecito, – F.Supp.2d –, 2003 WL 22056956 (S.D.N.Y., Sept. 9, 2003) . . . . . . . . 52

Pavon v. Swift Transportation Co., Inc., 192 F.3d 902 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . 53

Perry v. Ethan Allen, Inc., 115 F.3d 143 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), *superseded by statute
on other grounds* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

Rattner v. Netburn, 930 F.2d 204 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 34

Richardson v. New York State Department of Correctional Service, 180 F.3d 426
(2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Riedinger v. D'Amicantino, 974 F.Supp. 322 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . 28, 29, 37

Rodriguez v. Board of Education, 620 F.2d 362 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . 44

Snell v. Suffolk County, 782 F.2d 1094 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

Torres v. Pisano, 116 F.3d 625 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 33

United States v. One Tintoretto Painting, 691 F.2d 603 (2d Cir. 1982) . . . . . . . . . . . . . . . . . 18

Van Steenburgh v. Rival Company, 171 F.3d 1155 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . 43

Watts v. New York City Police Department, 724 F.Supp. 99 (S.D.N.Y. 1989) . . . . . . . . . . . . 32

Wilburn v. Fleet Financial Group, Inc., 170 F.Supp.2d 219 (D.Conn. 2001) . . . . . . . . . . . . . 40

Zimmerman v. Associates of First Capital Corporation, 251 F.3d 376 (2d Cir. 2001) . . . . . . . 51

*iii*

**State Cases**

Appleton v. Board of Education of the Town of Stonington, 254 Conn. 205 (2000) . . . . . . . . 45

Brittell v. Dep't of Correction, 247 Conn. 148 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Brown v. Ellis, 40 Conn. Supp. 165 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Cole v. Terrell Moorehouse, 2002 WL 31304178 (Conn.Super., Sept. 18, 2002,
Robinson-Thomas, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Connell v. Colwell, 214 Conn. 242 (1990)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

DeLaney v. Institute of Living, 2002 WL 1559043 (Conn.Super., June 18, 2002,
Shapiro, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Lapadula v. City of Middletown, 1994 WL 450329 (Conn.Super., Aug. 16, 1994,
Gaffney, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Leone v. New England Communications, 2002 WL 1008470 (Conn.Super.,
April 10, 2002, Quinn, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Mellaly v. Eastman Kodak Company, 42 Conn. Supp. 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Michaud v. Farmington Community Insurance Agency, 2002 WL 31415478
(Conn.Super., Sept. 25, 2002, Beach, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Perodeau v. City of Hartford, 259 Conn. 729 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 47, 48

**Federal Statutes**

42 U.S.C. §1981a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

42 U.S.C. §2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

42 U.S.C. §2000e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. §2000e-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

42 U.S.C. §2000e-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

42 U.S.C. §2000e-5 ................................................... 50

42 U.S.C. §2000e-16 .................................................. 50

**State Statutes**

C.G.S. §46a-51 *et seq.* ................................................ 1

*v*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | x | |
| CAROL PERRY, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:01 CV 1828 (CFD) |
| v. | : | |
| | : | |
| DOCTOR'S ASSOCIATES INC., | : | |
| Defendant. | : | |
| | x | OCTOBER 22, 2003 |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Carol Perry submits this memorandum of law in opposition to defendant

Doctor's Associates Inc.'s Motion for Summary Judgment dated July 30, 2003.

## I.    INTRODUCTION

Plaintiff brought this action against her former employer, Doctor's Associates Inc.

[DAI],[1] to seek redress for sexual harassment and retaliation including constructive discharge in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*, and

Connecticut's Fair Employment Practices Act, C.G.S. §46a-51 *et seq.*, and for intentional and

---

[1]    DAI is the owner of the Subway trademark and is the licensor and/or franchiser of the Subway restaurant chain.

negligent infliction of emotional distress she suffered as a result of the hostile and threatening

work environment at DAI under the common law of the State of Connecticut.

Defendant moves for summary judgment on plaintiff's federal and state law

discrimination and retaliation claims on the grounds that: 1) plaintiff cannot establish that she

was subjected to harassment on the basis of sex, 2) the harassment was not severe or pervasive

enough to constitute an actionable hostile work environment, 3) defendant cannot be held liable

for the hostile work environment created by plaintiff's coworkers because it "provided a

reasonable avenue for complaints" of sexual harassment and acted reasonably to remedy the

harassment in this case, and 4) plaintiff did not suffer any "adverse employment action" in

retaliation for making complaints about sexual harassment in this case. See Def.Mem. at 9-26.

As set forth fully below, defendant is not entitled to summary judgment on plaintiff's

discrimination and retaliation claims. The evidence in this case, when viewed in a light most

favorable to plaintiff as it must be on summary judgment, establishes or at the very least creates a

material factual issue concerning whether plaintiff's coworkers subjected her to a hostile work

environment on the basis of her sex because plaintiff, as a woman, was offended by their crude

and vulgar behavior and, therefore, according her female coworkers, was too sensitive,

"ladylike," moody, emotional or even emotionally unstable – *i.e.*, too stereotypically feminine.

The record evidence also establishes "severe or pervasive" harassment sufficient to amount to an

actionable hostile work environment in that plaintiff was subjected to constant severe,

threatening and humiliating conduct by her female coworkers – including vulgar, offensive,

hostile and abusive language and behavior and inappropriate touching – over the course of many

months which interfered with her ability to perform her job. Defendant is, furthermore, not

2

entitled to summary judgment on the issue of liability because, contrary to its argument, it failed

to act reasonably in that, despite notice of the hostile and abusive work environment and the

resulting severe emotional distress to plaintiff, management failed to correct or even investigate

the harassment, contrary to defendant's stated sexual harassment policy, and instead ignored,

tolerated or condoned the harassment, blaming and retaliating against plaintiff for the

circumstances. Finally, summary judgment must be denied with respect to plaintiff's retaliation

claims because the evidence establishes that DAI had notice of the harassment, but took no

action in response and allowed the hostile work environment to continue, that plaintiff's

coworkers became even more hostile, threatening and abusive toward plaintiff as a result and in

retaliation for complaining for their misconduct, but still DAI took no action. Plaintiff's work

environment became intolerable under the circumstances and she was forced to resign, having

been constructively discharged. Finally the only "remedial action" taken by defendant

constituted "adverse employment action."

Defendant also moves for summary judgment on plaintiff's state law claim for intentional

infliction of emotional distress [IIED] on the basis that the evidence in this case is insufficient to

establish "extreme and outrageous" behavior, and on plaintiff's negligent infliction of emotional

distress claim [NIED] on the basis that it is grounded on conduct occurring within an ongoing

employment relationship and, therefore, barred by the Connecticut Supreme Court decision in

Perodeau v. City of Hartford, 259 Conn. 729 (2002). See Def.Mem. at 26-34. Contrary to

defendant's arguments, the evidence in this case establishes "extreme and outrageous" behavior

in that management allowed plaintiff to be subjected to sexual harassment and retaliation by her

coworkers including vulgar sexual comments, inappropriate touching and hostile, abusive and

threatening behavior, despite knowledge of plaintiff's deteriorating emotional condition. Furthermore, plaintiff has a viable claim for NIED based on negligent conduct that occurred *during* the termination process.

Finally, defendant claims that it is entitled to summary judgment on plaintiff's claims for compensatory and punitive damages on the grounds that plaintiff does not claim "intentional" discrimination and cannot establish that defendant acted with "malice or reckless indifference" to her federally protected rights. See Def.Mem. at 34-39. Defendant's arguments are invalid because the evidence in this case establishes intentional discrimination under disparate treatment theory and, furthermore, that defendant acted with "malice or reckless indifference" in that it was aware of federal discrimination law, but disregarded the law and ignored or even condoned the harassment in this case, blaming plaintiff, the victimized employee, for the circumstances.

As set forth fully below, summary judgment must be denied in this case.

## II.    STATEMENT OF FACTS[2]

Plaintiff Carol Perry started working at DAI's Milford, Connecticut headquarters as a franchisee services coordinator in January 1989. See Ex. 12. Within two years, she was promoted to Senior Coordinator, a supervisory position, and, until she was constructively discharged from DAI in February 2000, received commendable to outstanding performance evaluations. See id.; Ex. 1 (Perry) at 33; Ex. 10 (Complaint) at ¶9. Plaintiff enjoyed her job very much and intended to remain at DAI until she retired at normal retirement age. See Ex. 10 at ¶9; Ex. 1 (Perry) at 158.

---

[2]    All exhibits referenced herein are attached to the Affidavit of Attorney Kathryn Emmett in Support of Plaintiff's Opposition to Summary Judgment dated October 22, 2003.

As a Senior Coordinator, plaintiff was responsible for supervising seven to nine coordinators assigned to sit in her aisle in the Franchisee Services Department. See Ex. 1 (Perry) at 14-15. Plaintiff's responsibilities as a supervisor included relaying information provided to her by management to the coordinators in her aisle, making sure that the work assigned to her aisle was completed, and preparing periodic written evaluations of each employee's work performance. See Ex. 1 (Perry) at 14, 193-94; E's. 21-25. Plaintiff was not authorized to discipline the coordinators in her aisle, other than verbally, without first obtaining permission from her supervisor, Linda Rizzo, the Franchisee Services Department Head. See Ex. 1 (Perry) at 87, 156-57, 193-94. See also Def's 9(c)(1) Stmt. at ¶21.[3]

In the Spring of 1998, a tightknit group of several female coworkers who had been assigned to work together in plaintiff's aisle, Diana Rich, Debbie Prince, Sharon Ewaskie, and Jackie Benedetto Krochko [Benedetto], started swearing frequently and having sexually explicit conversations at work.[4] For example, the women talked about their sex lives, made comments

---

[3]    For example, under defendant's employee handbook, monthly pay bumps in the amount of $3 were automatically granted employees who "perform[ed] an acceptable level of work" and could be withheld for "unsatisfactory" performance. See Ex. 11. Consistent with the handbook, the coordinators in plaintiff's aisle automatically received monthly bumps provided they performed their work. See Ex. 1 (Perry) at 25-28. Plaintiff was not allowed to withhold the pay bumps even where warranted by an employee's conduct unless she discussed it with Rizzo first and received her approval. See Ex. 1 (Perry) at 27; Def's 9(c)(1) Stmt. at ¶21. Under the handbook, employees could also be awarded a "double bump" or a $6 increase for "outstanding" work. See Ex. 11. Consistent with the handbook, plaintiff recommended and her coworkers received double bumps, with Rizzo's approval, when they completed extra work – e.g., when one employee was out on leave and others were required to cover the individual's workload. See Ex. 1 (Perry) at 25-28, 43-45, 103.

[4]    See Ex. 8 (Rich) at 17, 21 (four women were close friends); Ex. 7 (Prince) at 17-20 (same); Ex. 6 (Ewaskie) at 6, 11 (same); Ex. 5 (Buccieri) at 15 (four women were friends and "had their own little thing going on, their own little clique with their private conversations, and they didn't like people butting into them . . ."); Ex. 1 (Perry) at 97, 123-24. See also Ex. 14

about oral sex, asked plaintiff about her sex life – *e.g.*, asking her if she had a lot of sex or had "a problem with sex" – and questioned a young intern about whether she had had sex yet. See Ex. 14; Ex. 1 (Perry) at 97 (when plaintiff came into the office smiling, Ewaskie would comment that she must have "gotten it" the night before). Diana Rich brought a sex catalog and condoms in to work and passed them around to her coworkers joking about how many condoms she would have left after an anniversary trip with her husband.[5]  Plaintiff attempted to stop the women from engaging in this crude and offensive conversation and behavior, but they continued anyway, and when plaintiff complained about the misconduct and sought assistance in controlling the group from her supervisor, Linda Rizzo, Rizzo just shook her head in response to plaintiff's concerns.[6]

Because no action was taken by management to indicate that the behavior was unacceptable, the women continued to engage in the misconduct, and plaintiff continued to try to get them to stop and to seek assistance from Rizzo. See id.  Plaintiff's complaints and the fact

---

(plaintiff's contemporaneous notes); Ex. 4 (Benedetto) at 15, 24 (she and others in aisle swore a lot and joked about "rat bastard"); Ex. 8 (Rich) at 19 (women in the aisle said "fuck" and "rat bastards" repeatedly); Ex. 7 (Prince) at 49 (women in aisle laughed about "rat bastard" joke).

[5]     See Ex. 1 (Perry) at 50-52; Ex. 14; Ex. 8 (Rich) 15-16 (admitting that she brought sex paraphernalia booklet and condoms to work as show and tell and made a joke about how many condoms she was going to come back with after her anniversary trip with her husband); Ex. 7 (Prince) at 55-56 (Rich brought in lingerie catalog and had discussion about condoms); Ex. 6 (Ewaskie) at 13 (confirming that Rich brought "condom catalog" to work).

[6]     See Ex. 1 (Perry) at 54-57, 97-98, 147-48; Ex. 14; Ex. 8 (Rich) at 19, 22, 32, 48 (women in the aisle said "fuck" and "rat bastards" repeatedly even though plaintiff asked them to "tone it down" and "watch the topics of conversation"); Ex. 7 (Prince) at 42-44, 49 (plaintiff asked them to keep it down and not to use the term "rat bastard," but doesn't recall whether they continued to use the offensive language); Ex. 6 (Ewaskie) at 11-12 (plaintiff asked them to watch their topics of conversation); Ex. 4 (Benedetto) at 15, 24 (plaintiff asked them to stop swearing but they continued).  See also Ex. 9 (Youngblood) at 19 (everyone knew plaintiff was offended by inappropriate language in aisle).

that she was offended by their crude conduct infuriated the women – once they realized that their

vulgar behavior was personally offensive and upsetting to plaintiff and that she had complained

to management, they began to torment her in retaliation.[7] The women became increasingly

hostile and belligerent to plaintiff – e.g., *inter alia*, they complained that they did not want to do

the "fucking work," called plaintiff "asshole," when plaintiff left the department for meetings,

and asked her questions like "where the hell do you think you're going, you fuck?"; Jane

Youngblood, who was Linda Rizzo's assistant and a close friend of the four women,[8] called

plaintiff a "fucking asshole" or said or gestured to plaintiff "to kiss [her] ass" in front of

---

[7]    See Ex. 1 (Perry) at 55 ("Attitudes were formed" after plaintiff asked her coworkers to "tone it down"), 91, 94, 106-7 (the harassment "all stemmed because of me mentioning it to them that we should watch out topics of conversation."), 116 (coworkers made comments because they knew it was upsetting to her), 124-25; Ex. 8 (Rich) at 24, 34-35 (admitting she became angry with plaintiff because plaintiff attempted to discipline her for misconduct), 31-32, 41 (plaintiff became "very anxious" at some point after all four women joined her aisle and was very upset about what was going on in aisle); Ex. 7 (Prince) (there was tension in the aisle early on because plaintiff separated Rich and Ewaskie who wanted to sit next to each other); Ex. 6 (Ewaskie) at 17-18, 22-23 (admitting she was upset with plaintiff for moving her away from Rich and probably talked about it with her friends in the aisle and she "didn't have a problem with [plaintiff]" until she attempted to discipline her by asking her to leave the aisle).

[8]    See Ex. 9 (Youngblood) at 21 (admitting she was friendly with Rich, Prince, Ewaskie and Benedetto).

7

everyone."[9]  Diana Rich even physically threatened plaintiff, swinging a large mug at her in

anger. See Ex. 1 (Perry) at 67-70; Ex. 10 at ¶31; Ex. 14.[10]

Plaintiff immediately reported Rich's threatening conduct to Human Resources and

subsequently to Rizzo, who also became aware of the incident through another supervisor, and

Rizzo met briefly with the four women the next day, at their request. See Ex. 1 (Perry) at 70-75;

Ex. 2 (Rizzo) at 53-54, 93-97; Ex. 14.[11]  Rizzo did not discipline Rich or investigate the validity

of plaintiff's complaint. See Ex. 2 (Rizzo) at 54-57, 93-97. Instead, in response to plaintiff's

complaint that she had been physically threatened by *Rich*, Rizzo met with Rich, Benedetto,

Ewaskie and Prince together in a group, and discussed with them the "problems" *they* were

---

[9]     See Ex. 1 (Perry) at 62-64, 127-28; Ex. 14; Ex. 8 (Rich) at 20-21 (Youngblood "abruptly interrupted" plaintiff during a meeting and when plaintiff objected told her to "kiss [her] ass" or made gesture to that effect); Ex. 7 (Prince) at 51 (Youngblood either "flipped [plaintiff] off or told her to kiss her butt"); Ex. 4 (Benedetto) at 20-21 (Youngblood made "kiss my ass" gesture to plaintiff and then became upset with plaintiff for reporting it to management); Ex. 9 (Youngblood) at 12-19 (she made "kiss my ass" gesture to plaintiff and then became angry and refused to speak with plaintiff after she reported incident to management).

[10]     Defendant disingenuously claims that, at her deposition, plaintiff "*first* characterized Rich's gestures as 'talking with her hands' but then describes her as swinging the cup in a threatening manner." Def.Mem. at 7-8 (emphasis added). In fact, the suggestion that perhaps Rich was only "gesturing" came from defendant's counsel. See Ex. 1 (Perry) at 68. Plaintiff testified clearly that she found the incident threatening in that she was "leaning back because [she] thought [Rich] was going to hit [her]," Rich "was talking with her hands, and she was swinging [the cup]," she "thought [Rich] was going to hit her with it, so [she] backed up in [her] seat," and "if [she] didn't lean back, [she] would have got it across the cheek." See id. at 67-70. Plaintiff also testified that Rich "[t]otally flipped out" and was screaming at her at the time. See id.

[11]     After the meeting, the four women did not return to the aisle for several hours. See Ex. 1 (Perry) at 74; Ex. 14. When plaintiff called Rizzo to ask where the employees were because their work was being done by others, Rizzo remarked that "it was not her turn to watch them." Ex. 14. Compare with Ex. 2 (Rizzo) at 92 (admitting she responded something like "I don't know, you're their supervisor type thing.").

8

purportedly having with plaintiff. See id. According to Rizzo, she asked the women to "be patient" with plaintiff at the meeting because she had had "medical problems," blaming plaintiff and attributing her distress over the situation in the aisle to the fact that she had had a hysterectomy in 1999 – an explanation based solely on Rizzo's gender-biased view of plaintiff. Rizzo then told plaintiff "that she sometimes looks for things, little picayune things" and that "she should try to relax and not let it get to her." Ex. 2 (Rizzo) at 54-56, 92-93. See also Ex. 1 (Perry) at 70 (after plaintiff reported threatening incident involving Rich, Rizzo instructed her "[j]ust go back to your desk, relax, and ignore them."), 76 (after the meeting, Rizzo told plaintiff "they just think that sometimes [you] jump the gun" and instructed her "Just go back to your desk, relax, and ignore them."); Ex. 14.

The women also continued to use sexually explicit language and to engage in vulgar behavior to annoy and harass plaintiff because she had complained to management and because she was perceived by the women as too sensitive, emotional or "ladylike" in that she was offended by the behavior. See Ex. 14. For example, inter alia, Debbie Prince announced that her New Year's resolution was to begin wearing underwear, grabbed her breast and then claimed that she had forgotten to wear a bra that day.[12] The women joked about oral sex and passed around a nude photograph of a male coworker.[13] Debbie Prince commented to a franchisee that if he came to Connecticut, he could "sit under her desk anytime," and Jane Youngblood

---

[12]    See Ex. 1 (Perry) at 106-7; Ex. 14; Ex. 7 (Prince) at 57 (admitting underwear incident). See also Ex. 8 (Rich) at 19-20; Ex. 6 (Ewaskie) at 16.

[13]    See Ex. 1 (Perry) at 113, 138-39; Ex. 14; Ex. 7 (Prince) at 54-55 (admitting that there may have been discussions about "blow jobs" and that she may have asked whether someone "swallow[ed] or spit it out").

9

commented to plaintiff that she "bet [she] never got on [her] knees for [her husband]" and that that would be a "sight to see." Ex. 14.

Another woman in plaintiff's aisle, Agnes Buccieri, began touching her coworkers, including plaintiff – e.g., rubbing their shoulders – on a regular basis.[14]  Plaintiff told Buccieri repeatedly to stop touching her because it made her uncomfortable, but Buccieri just laughed. See Ex. 1 (Perry) at 82-85.  When plaintiff reported the problem to Rizzo, she responded that Buccieri's husband "probably didn't give her enough attention at home" and that plaintiff should "just []ignore it and tell her to stop." Id. at 84; Ex. 2 (Rizzo) at 36-37.  When plaintiff told Rizzo that she planned to speak with someone in HR about the problem, Rizzo discouraged her, claiming that she would "take care of it" – however, Buccieri continued to touch plaintiff and, when the touching did not stop and plaintiff complained further to Rizzo, Rizzo replied "just tell her it is making you feel uncomfortable." Ex. 1 (Perry) at 84-85.  See also Ex. 2 (Rizzo) at 37-38 (when plaintiff complained of Buccieri touching, she responded "You're their supervisor, you're there, you see it, it's your responsibility to take care of it.").

Diana Rich complained repeatedly to plaintiff, as her immediate supervisor, that Buccieri's behavior was making her uncomfortable. See Ex. 1 (Perry) at 58-59; Ex. 14; Ex. 8 (Rich) at 11-13.  Plaintiff went to management to report the problem and request guidance. See Ex. 1 (Perry) at 59; Ex. 14.  When Rich learned that plaintiff had reported the problem to management and that the conduct was being characterized as sexual harassment, she became

---

[14]    See Ex. 1 (Perry) at 82-83; Ex. 5 (Buccieri) at 14; Ex. 14; Ex. 8 (Rich) at 11-13 (Buccieri made her uncomfortable by rubbing her shoulders, staring at her and telling her that she loved her and touched others in aisle as well); Ex. 4 (Benedetto) at 14-15 (Buccieri made coworkers uncomfortable by rubbing their shoulders).

furious with plaintiff and warned her "don't ever do that again."[15] Because plaintiff reported the

sexually harassing touching by Buccieri to Rizzo and Human Resources, plaintiff's coworkers

again subjected her to retaliatory hostility, and management, once again, did not support plaintiff

in her efforts to stop the inappropriate behavior. According to Buccieri, management never even

spoke with her about the offensive touching.[16] Management's lack of support led the women in

plaintiff's aisle to believe their behavior was tolerated or even condoned by DAI.[17]

---

[15]    See Ex. 1 (Perry) at 62. See also Ex. 14; Ex. 8 (Rich) at 11-12 (admitting she
became angry with plaintiff for reporting her complaint to management because it was
characterized as possible sexual harassment and she did not perceive it that way). See also Ex. 7
(Prince) at 61.

[16]    See Ex. 14; Ex. 1 (Perry) at 59-62, 84-85; Ex. 8 (Rich) at 12-13; Ex. 7 (Prince) at
61. Compare Ex. 5 (Buccieri) at 13-15, 30 (no one ever talked with her about touching other
employees), Ex. 8 (Rich) at 12-14 (Rizzo met with her about Buccieri touching, but "pretty sure"
she never met with Kopazna), and Ex. 2 (Rizzo) at 17-18, 36-37 (no disciplinary action was
taken against Buccieri because Rich "didn't want to bring the issue up" and admitting that when
plaintiff complained of Buccieri touching she responded "You're their supervisor, you're there,
you see it, it's your responsibility to take care of it.") with Ex. 3 (Kopazna) at 103-4 (after
plaintiff reported situation to her, she met with Rich and then Buccieri to address situation and
subsequently confirmed with Rich that touching had stopped).

[17]    Plaintiff also repeatedly requested that Rizzo discipline Buccieri for her frequent
absences from work and told Rizzo that the fact that Buccieri's misconduct was not being
punished angered the women in her aisle and made them even more hostile to plaintiff. See Ex.
1 (Perry) at 87-88, 156-57; Ex. 2 (Rizzo) at 149; Ex. 14. Rizzo initially refused plaintiff's
requests to discipline Buccieri, but then finally disciplined Buccieri with a written warning
herself, many months later when plaintiff went out on disability leave due to job related stress.
See id.; Ex. 21. In its memorandum, defendant misrepresents the facts concerning the imposition
of discipline on Buccieri and claims incorrectly that *plaintiff* imposed the discipline on Buccieri.
See Def.Mem. at 4. Plaintiff also believed that she may have received permission from Rizzo
and issued a warning to Buccieri after the threatening incident involving Rich. See Ex. 1 (Perry)
at 87-88. However, as the written warning defendant cites for this claim proves, *Rizzo* imposed
the discipline on January 10, 2000, a day that plaintiff was out of work on stress-related leave.
See Ex. 21.

11

Plaintiff began suffering physically and emotionally as a result of the hostile and abusive

work environment, experiencing crying spells, chest pains and shortness of breath. See Ex. 1

(Perry) at 175-78. Even though plaintiff complained repeatedly to management making Rizzo

well aware of the hostile work environment in the aisle and the devastating emotional impact it

was having on her, management failed to take any meaningful action in response to plaintiff's

complaints.[18] Rizzo callously explained at deposition that she did not intervene because

"[plaintiff's work] was getting done" and she "didn't see that [her work] wasn't getting done or

was being done poorly." Ex. 2 (Rizzo) at 144-45.[19]  Instead, defendant in effect condoned the

_____

[18]    See Ex. 2 (Rizzo) at 60 (aware plaintiff was seen breathing into a paper bag in the
office one day, "[cried] at her desk a lot," and had to go to the hospital on one occasion). See
also Ex. 14; Ex. 1 (Perry) at 34, 38 (Rizzo told her repeatedly "just document" it), 56 (when
plaintiff told Rizzo about sexual comments by Rich, Rizzo "just shook her head"), 70 (after
threatening argument with Rich, plaintiff complained to Rizzo and requested that Rich be
removed from her aisle -- Rizzo responded "[j]ust let it blow over, try to ignore it, try not to get
yourself upset"), 84 (when plaintiff reported Buccieri touching, Rizzo responded that her
husband probably didn't give her enough attention at home and "just [] ignore it and tell her to
stop"), 147-48 (plaintiff complained to Rizzo constantly and her response was "just try to calm
down and ignore it, or say something to them, which [plaintiff] would do, and [they] would end
up with another problem" and when she informed Rizzo that they ignored her admonitions,
Rizzo responded "Try to just calm down, do your work, go back to your desk and try to ignore
them."); Ex. 2 (Rizzo) at 44 ("[plaintiff] came to me on a number of occasions and would say to
me: They're vicious, they're out of control."), 54 (plaintiff came to me repeatedly to express
worry about the circumstances in the aisle), 81 (plaintiff complained about Benedetto swearing in
the aisle several times), 88 (admitting that plaintiff told her that the women in the aisle were
making sexual remarks and that she told her just to ignore them), 60 (someone may have told her
that plaintiff was afraid of someone in her aisle); Ex. 9 (Youngblood) at 14 (plaintiff "could have
worn a path" to Rizzo's office and was "too busy complaining all the time").

[19]    Rizzo also testified that she did not credit plaintiff's complaints because she did
not personally observe the misconduct about which plaintiff complained when she visited the
aisle. See Ex. 2 (Rizzo) at 48, 50-53, 64. Rizzo did not investigate plaintiff's complaints,
however [see id.] and never asked to see plaintiff's notes documenting the conduct that plaintiff
kept in response to Rizzo's request. Compare Ex. 1 (Perry) at 38, 154 with Ex. 2 (Rizzo) at 49.
As plaintiff's notes demonstrate and the deposition testimony of the women who were involved
in the misconduct shows, the gross and offensive behavior about which plaintiff was complaining

harassing behavior by refusing to act on plaintiff's complaints and left plaintiff, a low-level supervisor, completely unsupported in her efforts to deal with the situation.

Although DAI maintained a written sexual harassment policy [see Ex. 11] and distributed the policy to employees as part of an employee handbook, non-supervisory employees were not provided any instruction concerning the policy and/or what constitutes sexual harassment.[20]  In fact, neither the employees nor the Department Head, Linda Rizzo, understood the policy and/or what constitutes sexual harassment.[21]  In addition, management did not *enforce* the sexual

---

did, in fact, occur. See Ex. 14; footnotes 4-5, 9, 12-14 *supra*. It is plaintiff's position that Rizzo did not respond or take any action to correct the situation because the women who worked in the franchisee services department completed the work that was assigned to them and Rizzo simply wanted to keep them happy – *i.e.*, she didn't want to "rock the boat." See e.g., Ex. 2 (Rizzo) at 70-71 (indicating that she couldn't relocate any of the employees to another aisle because they "did their work, they worked well together" and "from what I could observe from her aisle, they were all working fine and it wasn't a problem" that needed to be addressed).

[20]    See Ex. 2 (Rizzo) at 31; Ex. 3 (Kopazna) at 21; Ex. 4 (Benedetto) at 30 (was given copy of company handbooks, but never read them); Ex. 5 (Buccieri) at 26 (never reviewed sexual harassment policy and no one went over it with her).

[21]    See Ex. 2 (Rizzo) at 32-36 (not sure whether company has obligation to investigate harassment if victim does not want investigated), 40 (does not believe that any violations of company's sexual harassment policy have occurred in her department and "[n]ot that [s]he's aware of to the extent where someone is complaining and wants something done about it"), 85-86 (not aware of any company policy that prohibits circulating calendar of scantily-clad employees); Ex. 8 (Rich) at 17 (did not know that bringing sex paraphernalia catalog and condoms into workplace would violate company's sexual harassment policy); Ex. 7 (Prince) at 80-83 (doesn't recall receiving any instruction about what constitutes sexual harassment and thinks that offensive language or speech that makes one feel uncomfortable would not be sexual harassment), 57-58 (comment regarding forgetting to wear underwear at work would not necessarily be against company policy because "you sit around and joke"); Ex. 9 (Youngblood) at 37-38 (whether employee should be reprimanded for sexual harassment depends on whether anyone complains); Ex. 5 (Buccieri) at 30 (no one ever talked with her about touching other employees and no idea whether that would be a violation of company's sexual harassment policy). See also Ex. 7 (Prince) at 58-59 (one of the women was given calendar of scantily clad men as Christmas gift at work and *owner* of company, Fred DeLuca, saw it and laughed).

13

harassment policy. The women in plaintiff's aisle testified that plaintiff's reports of misconduct were never investigated and that no discipline was imposed as a result of their behavior.[22]

As stated, plaintiff became extremely distressed about the circumstances in the aisle and, on January 7, 2000, met with Linda Rizzo and Wendy Kopazna of Human Resources to plead with them that the four women be split up. See Ex. 1 (Perry) at 153, 166-68; Ex. 3 (Kopazna) at 73-74. Even though there were spaces available in other aisles [see Ex. 13] and Human Resources was amenable, Rizzo refused plaintiff's request to relocate the women for so-called "practical reasons." See Ex. 3 (Kopazna) at 73-76 (plaintiff requested that women be split up and Kopazna didn't see a "huge problem with it," but Rizzo refused because it "wasn't practical"); Ex. 2 (Rizzo) at 68-70 (in response to plaintiff's request to split women up, told her that she can't move employees around when they work well together and are getting their work done); Ex. 1 (Perry) at 153-54, 167 (when she asked Rizzo to split up aisle, her response was that she had nowhere to put them).[23] Management instead responded to plaintiff's plea by suggesting

---

[22]    See Ex. 8 (Rich) at 40 (indicating that she has never been reprimanded by any supervisor for her conduct and was never even spoken to about plaintiff's complaints to management); Ex. 7 (Prince) at 41 (received only one reprimand during course of employment for having alcohol in her desk), 63 (was never spoken to concerning plaintiff's complaints to management); Ex. 6 (Ewaskie) at 10, 31 (never reprimanded for any misconduct and not aware of anyone else ever being disciplined for offensive conduct); Ex. 5 (Buccieri) at 13-14, 24 (management never spoke to her about offensive touching and never asked her about situation in aisle). Compare Ex. 4 (Benedetto) at 9,18-19 (indicating that she was given a written reprimand once for inappropriate language but never spoken to otherwise about plaintiff's complaints) with Ex. 2 (Rizzo) (told Benedetto once that if she was swearing, had to stop, but didn't document because "[didn't] know if she was doing it, except for [plaintiff's] telling me she had"). See also Ex. 2 (Rizzo) at 73-76 (did not investigate plaintiff's complaints to determine whether there was any factual basis even after receiving copies of her contemporaneous notes).

[23]    Even though Rizzo claimed that it was not "practical" to split up the women, immediately after plaintiff resigned because she could no longer tolerate working in such a hostile environment, the women were, in fact, split up and have not worked together since. See

14

other options that did not address the women's misbehavior and instead put the burden of their wrong-doing on plaintiff. Plaintiff could: 1) continue as supervisor of the aisle under the same circumstances, 2) resign her supervisory position and return to the position of Coordinator, *possibly* at the same rate of pay, or 3) voluntarily terminate her employment with DAI. See Ex. 1 (Perry) at 167-68; Ex. 2 (Rizzo) at 123-24; E's. 19-20.[24]

After the meeting, extremely distressed by management's response and the continuing harassment and retaliation inflicted by her coworkers, plaintiff began having chest pains and was taken to the hospital suffering from an anxiety attack. See E's. 29-30. On the advice of her physician, plaintiff took a 10 day leave of absence due to the stress caused by the circumstances at work. See Ex. 15; Ex. 1 (Perry) at 175-76. Still, despite management's awareness of the impact on plaintiff's physical and emotional health, no action was taken to investigate or remedy the situation and, instead, Rizzo continued to counsel plaintiff that she would have to learn to "ignore them." Ex. 14.[25]

---

Ex. 7 (Prince) at 21; Ex. 3 (Kopazna) at 76-77.

[24]    As reflected in Wendy Kopazna's notes, Rizzo and Kopazna initially asked plaintiff to consider four options – 1) remain as supervisor of the aisle, 2) resign her supervisory position and return to the position of Coordinator, possibly at the same rate of pay, 3) terminate her employment with DAI, or 4) transfer to another position by supervising the aisle of another supervisor who was planning to retire shortly. See Ex. 1 (Perry) at 167-68; Exs. 19-20. However, the offer to supervise the other aisle was withdrawn on the basis that the other supervisor decided not to retire after all, and plaintiff was never offered any other position at the company. See Ex. 1 (Perry) at 167-68.

[25]    See also Ex. 2 (Rizzo) at 60; Ex. 3 (Kopazna) at 81-83 (fact that plaintiff was suffering from medical problems due to her employment, as reflected in short-term disability claim form produced by DAI, was "really not [their] business"), 86-90 (acknowledging that Human Resources informed workers' compensation carrier that plaintiff was engaged in "normal job duties" when she suffered stress and anxiety from work, chest pains, and hypertension," but stating that that knowledge did not increase her concern as to what was occurring in the aisle);

15

When plaintiff returned to work after her leave, the hostile and threatening behavior continued. See Ex. 14; Ex. 10 at ¶29. Plaintiff complained to Rizzo that she was scared of the women and how vicious they had become, but Rizzo continued to refuse to split up the aisle and instructed plaintiff to try to ignore the women. See id. Plaintiff continued to suffer from anxiety, chest pains, sleep disturbance and shortness of breath, and was forced to seek psychological treatment as a result of the circumstances at work and, on the advice of her physician, took a second leave of absence beginning at the end of January 2000. See Ex. 1 (Perry) at 175-78; E's. 16-18, 29, 31-32.

When plaintiff returned to work in February, although Wendy Kopazna of Human Resources agreed to meet again with plaintiff concerning the problems in the aisle, that meeting never took place. See Ex. 14; Ex. 10 at ¶40.[26] Instead, after her coworkers learned that plaintiff had commented to another supervisor that she would be "out of [her] mind" to consider taking Jackie Benedetto in her department because of the problems plaintiff had encountered supervising her, *inter alia*, her coworkers threw a party for Benedetto for being "singled out" by plaintiff and treated unfairly, Benedetto refused to speak with plaintiff and called her a "useless

---

Exs. 17-18 (documents reflecting that management was aware that plaintiff was suffering emotional distress as a result of the circumstances at work).

[26]    Because she was desperate by that time to put an end to the hostile and abusive behavior and knew that management was not going to take any action to correct the situation, plaintiff wrote a card to her coworkers in an effort to end their hostility toward her, apologizing for her behavior, letting them know that she was "very proud of each and everyone of [them]" and asking that they "forgive [her] and maybe like [her] just a little again." Ex. 27. See also Ex. 1 (Perry) at 150 ("I was having such a rough time trying to deal with the situation, I even wrote a little thank you to them asking them if they could, you know, I told them I've been under - I don't know the exact words -- and if they could just, you know, maybe like me again, we can work things out. I was so desperate, I was willing to do anything.").

bag of shit," and management instructed plaintiff to stay at her desk and not make the women angry. See Ex. 1 (Perry) at 159-61; Ex. 14; Ex. 10 at ¶41-44.

Unable to continue working in that environment, plaintiff left Rizzo a voicemail indicating that she had decided that she no longer wanted to be a supervisor. See Ex. 14; Ex. 10 at ¶45. That afternoon, when plaintiff attempted to hand out copies of a report to her coworkers, they refused to acknowledge her, and Benedetto knocked the copy of the report plaintiff put on her desk into the trash can. See Ex. 14; Ex. 1 (Perry) at 162. When plaintiff returned to her desk, she found a threatening note warning her that she had "better be careful in the parking lot" because "you never know when a truck is going to hit you." See Ex. 14; Ex. 1 (Perry) at 162. Emotionally distraught and in fear for her safety at work, plaintiff informed Rizzo and Wendy Kopazna that she quit because she could not take it anymore. See Ex. 1 (Perry) at 162-63; Ex. 10 at ¶47. Plaintiff, thus, resigned her employment with DAI, having been constructively discharged.[27]

---

[27]     While plaintiff's coworkers admitted much of the misconduct alleged by plaintiff, they denied acting in a threatening manner towards plaintiff and disingenuously claimed that plaintiff, who had little or no history of problems supervising and/or interacting with her coworkers over the many years she worked at DAI prior to supervising these four women, simply became upset and/or enraged for *no* reason including on the day she resigned her employment when plaintiff, who could no longer withstand the abuse, swore at Jackie Benedetto saying something to the effect of "take the job and stick it up her ass" in response to Benedetto's comment "where the fuck does she think she is going." See Ex. 14; Ex. 1 (Perry) at 164. See, e.g., Ex. 7 (Prince) at 22-23 (plaintiff was a "drama queen" in that "[s]he would just have outbursts of rage for no reason at all"), 79 (on the morning plaintiff resigned, "we were all doing our work and it was pretty quiet in the aisle and [plaintiff] just got up and was gone for fifteen, twenty minutes, half hour, I don't recall the exact time and she came back, grabbed her coat and told Jackie, "Fuck you, Jackie, I quit" and she left and we were all sitting there dumbfounded."); Ex. 6 (Ewaskie) at 26-27 ("[plaintiff] would sometimes just get up in the middle of the day and go breathe in a paper bag in the middle of the pod and we didn't know why"), 32 (on the day plaintiff resigned, she came in "[a]nd I says to Diana I says, wow, [she] looks like she's upset or something. And then, I don't know what happened, she left and she came back and she quit. . . .

Defendant's own expert witness, F. Carl Mueller, M.D., who conducted a psychiatric examination of plaintiff, confirms that plaintiff suffered and continues to suffer emotional distress as a result of the hostile work environment at DAI. See Ex. 28 (Mueller report). Based on his review of certain documentation relating to this case including plaintiff's medical records and his medical examination of plaintiff on or about February 14, 2003, Dr. Mueller found that the "interchange" between plaintiff and her coworkers and management "did likely result in an anxiety/depressive cluster of symptoms, the residual of which are still present" and that there is no evidence of malingering on plaintiff's part. Ex. 28. Dr. Mueller concluded that "[plaintiff] clearly suffers from reactive psychiatric symptoms worsened by her work environment" and that "[h]er current residual pathology can be attributable to her frustrations with her prior work environment as it interplayed with her personality structure." Id. As Dr. Mueller notes, plaintiff's condition has gradually improved, but she continues to require psychiatric treatment and medication to control the emotional distress and resulting symptoms caused by the hostile and abusive work environment. See Ex. 32.

## III.    ARGUMENT

### A.    STANDARDS

In reviewing a motion for summary judgment, the "court must 'resolve all ambiguities and inferences . . . in the light most favorable to the party opposing the motion,' United States v. One Tintoretto Painting, 691 F.2d 603, 606 (2d Cir. 1982) (citations omitted), and may grant the

---

She said, F you, Jackie, I quit."); Ex. 8 (Rich) at 30 (explaining that the day plaintiff resigned Rich was on the telephone and plaintiff "jumped up, yelled and walked out"), 40-41 (indicating that plaintiff went to Rizzo "probably four or five times a day" because she was upset about what was going on in the aisle and the reaction of the women in the aisle was "Now what?").

18

motion only if 'there is no genuine issue as to any material fact and . . . the moving party is

entitled to judgment as a matter of law.'  Fed. R. Civ. P. 56(c)."  Celotex Corp. v. Catrett, 477

U.S. 317, 331 (1986).  See also Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991).

Defendant, as the moving party, has the burden of demonstrating clearly the absence of any

genuine issue of fact and showing its entitlement to a favorable determination under applicable

principles of substantive law.  See Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970).  On

summary judgment, the court must not try issues of fact; rather it must only determine whether

there are such issues to be tried.  See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36-37

(2d Cir. 1994).  "If, as to the issue on which summary judgment is sought, there is any evidence

in the record from any source from which a reasonable inference could be drawn in favor of the

nonmoving party, summary judgment is improper."  Id.

    "[I]n an employment discrimination case when, as here, the employer's intent is at issue,

the trial court must be especially cautious about granting summary judgment."  Kerzer v. Kingly

Manufacturing, 156 F.3d 396 (2d Cir. 1998).  See also Distasio v. Perkin Elmer Corporation, 157

F.3d 55, 61 (2d Cir. 1998) ("Summary judgment should be used 'sparingly' when, as is often the

case in sexual harassment claims, state of mind or intent are at issue."); Dobrich v. General

Dynamics Corp., 40 F.Supp.2d 90, 94 (D.Conn. 1999) ("the Second Circuit has held that a

district court should exercise particular caution when deciding whether summary judgment

should issue in an employment discrimination case.").

19