**B.   DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR SEXUAL HARASSMENT**

**1.   Plaintiff was subjected to harassment because of sex.**

Defendant argues first that it is entitled to summary judgment on plaintiff's sexual harassment claims under federal and state law on the basis that plaintiff cannot establish that she was subjected to harassment on the basis of her sex. See Def.Mem. at 11-26.[28] Contrary to defendant's argument, the evidence presents, at the very least, a material factual issue concerning whether plaintiff's coworkers subjected her to a hostile and abusive working environment on the basis of sex because, as a woman, plaintiff was offended by and could not tolerate their crude behavior and, therefore, was perceived by her coworkers as being too sensitive, "ladylike," moody, emotional or even emotionally unstable or too stereotypically female.

In Oncale v. Sundowner Offshore Services, Incorporated, 523 U.S. 75 (1998), the United States Supreme Court construed Title VII's prohibition against "discriminat[ion] . . . because of . . . sex" to include same-sex sexual harassment in the workplace, noting that "'[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.'" Oncale at 78-79 (quoting Castaneda v. Partida, 430 U.S. 482, 499 (1977)). The Court explicitly indicated that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Id. at 80-81.

---

[28]   "In defining the contours of an employer's duties under [Connecticut] state antidiscrimination statutes, [Connecticut courts] have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964, the federal statutory counterpart to [C.G.S. §46a-60]." Brittell v. Dep't of Correction, 247 Conn. 148, 164 (1998).

Since Oncale, courts have interpreted Title VII and the Oncale decision to prohibit same sex sexual harassment that is motivated, *inter alia*, by hostility to an individual who does not conform to the stereotypes of his or her gender. See Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864, 869 (9th Cir. 2001) (reversing judgment in favor of Azteca on plaintiff's hostile work environment claim where plaintiff was verbally harassed by his male co-workers because he was perceived as too effeminate for a man); Bianchi v. City of Philadelphia, 183 F.Supp.2d 726, 735 (E.D.Pa. 2002) ("A plaintiff may prove same sex sexual harassment by . . . illustrating that the 'harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender.'") (Quoting Bibby v. Philadelphia Coca Cola Bottling Company, 260 F.3d 257 (3d Cir. 2001); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 n.3 (1st Cir. 1999) (while Civil Rights Act of 1991 overruled Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) decision in part, Price Waterhouse's holding that Title VII prohibits subjecting a female employee to adverse employment consequences because she does not match the social stereotypes associated with her gender remains viable).

For example, in Heller v. Columbia Edgewater Country Club, 195 F.Supp.2d 1212 (D.Oregon 2002), the court denied summary judgment in favor of the defendant employer where the plaintiff, a lesbian, provided sufficient evidence that she had been subjected to constant derogatory comments because she did not meet "[her female supervisor's] stereotype of how a woman ought to behave." Heller at 1224. The court analyzed the "because of sex" requirement as follows:

> If an employer subjected a heterosexual employee to the sort of abuse allegedly endured by [the plaintiff] – including numerous unwanted offensive comments regarding her sex life – the evidence would be sufficient to state a claim for violation of Title VII. The result should not differ simply because the victim of the harassment is homosexual. *Cf.*

21

*Doe v. City of Belleville*, 119 F.3d 563, 575 (7th Cir. 1997) (observing that if the plaintiff in that case had been a woman instead of a man, "there would be no agonizing over whether the harassment . . . described could be understood to be sex discrimination"), *vacated and remanded for reconsideration in light of Oncale*, 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998) (case settled on remand). Certainly the behavior is no less offensive, and the impact upon the employee's working environment is as great. The offensive conduct in question here does not appear to have been motivated by sexual desire on the part of [the female supervisor], but sexual desire is not a prerequisite to liability under Title VII. *See Oncale*, 523 U.S. at 80 ("harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex"); *City of Belleville*, 119 F.3d at 586-88 ("no case that we are aware of holds that the harasser must have been sexually interested in the victim in order for a claim of sexual harassment to be viable.").

In *Oncale*, the Supreme Court observed that – regardless of whether the sexual harassment is by a member of the same gender or of the opposite gender – the plaintiff must still "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discriminat[ion]* . . . because of . . . sex." *Id.* at 81 (emphasis in original). One way (but certainly not the only means) of satisfying this requirement is to inquire whether the harasser would have acted the same if the gender of the victim had been different. *Id.* at 80-81. A jury could find that [the female supervisor] would not have acted as she (allegedly) did if Plaintiff were a man dating a woman, instead of a woman dating a woman. If that is so, then Plaintiff was discriminated against because of her gender.

Id. at 1222-23 (footnotes omitted).

As in Heller, the female plaintiff in this case was subjected to constant sexual, humiliating and/or abusive comments by her female coworkers because of her sex – more specifically, because she, as a woman, was offended by their crude and vulgar behavior and, therefore, according her female coworkers, was too sensitive, "ladylike," moody, emotional or even emotionally unstable – *i.e.*, too stereotypically feminine. The only difference between this case and Heller is that in Heller the plaintiff was perceived as being too little like the traditional

stereotype of a female (or too masculine),[29] whereas here plaintiff was perceived as being too much like the traditional female stereotype.

As noted in the quoted language from Doe v. Belleville in Heller, "there would be no agonizing over whether the harassment . . . described could be understood to be sex discrimination" if Heller and her coworkers had not been of the same sex. As in Heller, if plaintiff or her coworkers here had been male, there also would be no question that the offensive behavior constituted sexual harassment. Because plaintiff refused to join in her coworkers' crude discussions and expressed her discomfort as a woman with the topics of conversation, and also because she expressed her sensitivity by complaining about their offensive conduct to management, plaintiff's coworkers tormented her by continuing to engage in vulgar speech and flaunting their sexual behavior and became hostile, abusive and ultimately threatening to plaintiff. See Ex. 1 (Perry) at 55, 91, 94, 106-7, 116, 124-25. It is reasonable to infer that if plaintiff had been male, her coworkers would not have tormented her by subjecting her to a barrage of sexual banter and would not have gotten angry at her for being offended by their crude behavior.

The harassment plaintiff suffered, therefore, constitutes discrimination on the basis of sex. At the very least a material factual issue exists concerning whether the harassment was "because of sex" or for some other reason, and summary judgment must be denied. See Kerzer v. Kingly Manufacturing, 156 F.3d 396, 402 (2d Cir. 1998); Distasio v. Perkin Elmer

---

[29] See also Price Waterhouse v. Hopkins, 490 U.S. 228, 256 (1989), *superseded by statute on other grounds* (discrimination on the basis of sex found where sex stereotyping played part in promotional decision in that female employee was perceived as failing to meet "stereotypical notions about women's proper deportment.")

23

Corporation, 157 F.3d 55, 61 (2d Cir. 1998). See also Dortz v. City of New York, 904 F.Supp. 127, 148 (S.D.N.Y. 1995) (". . .the function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.'") (Quoting Cronin v. Aetna Life Insurance Company, 46 F.3d 196, 204 (2d Cir. 1995); Chambers v. TRM Copy Centers Corporation, 43 F.3d 29, 38 (2d Cir. 1994)).[30]

### 2. The harassment in this case was sufficiently severe and pervasive to amount to an actionable hostile work environment.

Defendant also argues that it is entitled to summary judgment on plaintiff's discrimination claims on the basis that the harassment was not sufficiently "severe or pervasive"

---

[30] Defendant argues against plaintiff's claim that the harassment she endured was motivated by sex by blaming plaintiff for her coworkers' obnoxious behavior, claiming that she subjected her subordinates to, *inter alia*, "unpredictable mood swings" and "spontaneous bouts of crying and unfounded accusations of misconduct." Def.Mem. at 13-14. As the record demonstrates, plaintiff made no "unfounded" accusations of misconduct – virtually all the offensive conduct about which plaintiff complained and which she documented in her notes at Rizzo's request has been admitted by her coworkers. See Ex. 14; footnotes 4-5, 9, 12-14 *supra*. Contrary to defendant's argument and as defendant's own records establish, plaintiff's deteriorating emotional condition was the *effect,* not the *cause* of her coworkers' harassment. See, e.g., E's. 17-18, 28-32. That defendant's discrimination against plaintiff was motivated by sex is further underscored by the fact that defendant's witnesses tried to explain plaintiff's emotional upset by pointing to a hysterectomy she had in the summer of 1999; defendant also suggests in its memorandum that plaintiff was suffering from some unrelated medical or emotional condition on the basis that plaintiff told Rizzo she was "on medication" and "would be fine," when in fact plaintiff informed Rizzo that she was on medication to treat the stress she was experiencing as a result of the environment at work. See Ex. 2 (Rizzo) at 54-56; Ex. 3 (Kopazna) at 99-100; Def.Mem. at 8, 14; Def's 9(c)(1) SMT. at ¶69. See also Ex. 7 (Prince) at 73-74 (thinks plaintiff was going through menopause and just "flipped out"). This explanation in itself represents a negative female stereotype and was offered with no basis in fact and in direct conflict with the cause noted on a workers' compensation form prepared by defendant – *i.e.*, "stress and anxiety from work" – and found by defendant's expert witness in connection with this case. See E's. 18, 28.

to amount to an actionable hostile work environment, breaking down some, but not all of the harassment, into discrete incidents. See Def.Mem. at 15-19. Contrary to defendant's argument, the record evidence, when viewed as a whole, establishes that plaintiff was subjected to constant severe, threatening and humiliating conduct by her coworkers, including vulgar, offensive, hostile and abusive language and conduct, over the course of many months which interfered with plaintiff's ability to perform her job. Therefore, the harassment was sufficiently severe and pervasive, and summary judgment must be denied on this issue.

To establish a hostile work environment, "the plaintiff must show that his or her workplace was permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 62 (2d Cir. 1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993)). "Whether an environment is 'hostile' or 'abusive' depends on the totality of the circumstances." Id. (quoting Harris at 23). "Courts must consider a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. "These factors must be evaluated from both a subjective and an objective viewpoint." Id. (citing Harris at 21-22).

> [S]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all of the circumstances." . . . In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish

between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Oncale at 81-82. See also Torres v. Pisano, 116 F.3d 625, 631-32 (2d Cir. 1997) ("The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases. . . . Whenever the harassment is of such a quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment.").

There is voluminous evidence of harassing behavior in this case that at the very least creates a material factual dispute concerning whether plaintiff's work environment was hostile. As set forth in detail in plaintiff's Statement of Facts *supra*, plaintiff was subjected, over the course of many months, to, *inter alia*, a barrage of vulgarity, including comments about oral sex and plaintiff's own sex life, offensive behavior including one woman grabbing at her breast and the passing around of a sex toy catalog and condoms, abusive language directed at plaintiff including being called "asshole" and "fuck" and repeated swearing at others, inappropriate touching by a female coworker, and at least two incidents of threatening behavior.[31]

---

[31] Defendant also claims that the harassment in this case was not sufficiently severe or pervasive on the basis that the "majority of the strong language was not directed at plaintiff." Plaintiff disputes this claim factually [see Statement of Facts, *supra*], and legally. See Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) ("Evidence of a general work atmosphere . . . – as well as evidence of specific hostility directed toward the plaintiff – is an important factor in evaluating [whether harassment is sufficiently severe or pervasive]."); Dortz v. City of New York, 904 F.Supp. 127, 150 (S.D.N.Y. 1995) (evidence of offensive statements made to other staff were relevant to assessment of hostile work environment including because they "interfered with and undermined Plaintiff's ability to function in a supervisory capacity.").

26

In addition to the overwhelming evidence supporting an objectively hostile environment, substantial evidence supports that plaintiff subjectively perceived the work environment as hostile. Plaintiff suffered anxiety attacks, chest pains, bouts of crying and sleeplessness, took two leaves of absence from work, was admitted to the hospital, and was required to seek psychiatric treatment as a result of the work environment at DAI. See Statement of Facts *supra*. "The effect on the employee's psychological well-being is, of course, relevant to determining whether plaintiff actually found the environment abusive." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). Defendant's own expert witness, Dr. Mueller, confirms that plaintiff suffered and continues to suffer emotional distress as a result of the work environment. See Ex. 28 (Mueller report).[32]

Where, as here, the evidence shows that the harassment was constant, severe, threatening, humiliating and interfered with plaintiff's ability to perform her job, the issue of whether the harassment was sufficiently severe or pervasive to constitute actionable sexual harassment presents a question of fact that must be resolved at trial. See e.g., Torres at 632-33 (reasonable

---

[32] Defendant also suggests in its memorandum that plaintiff was not really offended by her coworkers' vulgar behavior, claiming in support that plaintiff gave a former coworker a "crotchless bustier" at a bridal shower sometime prior to 1993. See Def.Mem at 3, 13. Defendant has not produced the item, but plaintiff states that a bustier is not an unseemly garment, but rather is a typical item of clothing worn under bridal gowns by women, often in combination with a garter to hold up stockings, and, of necessity, is "crotchless" to allow the woman to use the bathroom. See Ex. 33. Even assuming *arguendo* that plaintiff gave an inappropriate gift to a coworker, the fact that a plaintiff participated in some, what could be characterized as, "horseplay" or "female bonding" with coworkers does not mean that other conduct was not objectionable and unwelcome to plaintiff. See e.g., Dobrich v. General Dynamics Corp., 106 F.Supp.2d 386, 391 (D.Conn. 2000) ("Even though plaintiff is herself no shrinking violet and occasionally used foul language on the job, that does not undercut her legal protections against unwelcome sexual harassment in the workplace."); Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864, 873 (9th Cir. 2001).

woman would find her work environment abusive when supervisor, *inter alia*, repeatedly made sexual comments and referred to her in derogatory terms); Kotcher v. Rosa and Sullivan Appliance Center, 957 F.2d 59, 63 (2d Cir. 1992) (evidence of vulgar comments and gestures on regular basis and one incident of arm grabbing sufficient to support hostile work environment); Newtown v. Shell Oil Company, 52 F.Supp.2d 366, 372 (D.Conn. 1999) (allegations of derogatory name calling only by co-supervisor sufficient to create triable issue of fact for jury as to whether plaintiff suffered hostile work environment). See also Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864, 873 (9th Cir. 2001) (work environment was objectively and subjectively hostile where plaintiff was subjected to insulting comments, name-calling and vulgarities on the basis that he was perceived as "effeminate" by his coworkers); Heller v. Columbia Edgewater Country Club, 195 F.Supp.2d 1212, 1225-26 (D.Oregon 2002) (evidence of repeated derogatory and offensive comments by plaintiff's supervisor relating to her homosexuality sufficient to create factual issue as to whether harassment was severe or pervasive); Riedinger v. D'Amicantino, 974 F.Supp. 322, 327 (S.D.N.Y. 1997) (vulgar comments, gesture and some physical contact sufficient to establish hostile work environment).

### 3.   **Defendant is liable for coworker harassment in this case.**

Defendant argues that it cannot be held liable for the coworker harassment in this case because it "provided a reasonable avenue for complaints" in that it had a sexual harassment policy with complaint procedure in place which required it to investigate complaints of harassment, but claims that it did not have adequate notice of the harassment until January 2000 because plaintiff's complaints were too "vague" making it "impossible for [defendant] to respond." See Def.Mem. at 20-22. Defendant claims further that once plaintiff "identified" the

28

women with whom she was having problems in January 2000, it took appropriate remedial action by offering plaintiff the alternatives of continuing to supervise the same women using the "tools available to her to properly supervise her subordinates," transferring to another department or resigning as supervisor without a diminution in pay. See Def.Mem. at 22. Defendant also argues that it cannot be held liable on the basis that plaintiff failed to use her "authority as a supervisor" to correct her coworkers' misbehavior and, therefore, failed to avoid the harm. See id.[33]

Defendant's arguments are specious. In fact, as set forth below, DAI management was well-aware of the hostile work environment because plaintiff complained repeatedly to management concerning the harassing behavior, consistent with the company's sexual harassment policy. Despite the fact that plaintiff informed management about the harassment and made it clear that she needed management's help to address the problem, management did not investigate plaintiff's complaints in violation of its own sexual harassment policy or take any action whatsoever to correct the situation, but rather ignored plaintiff's complaints, indicating that the company tolerated or even condoned the harassment, and left plaintiff to suffer in an intensely hostile working environment. Furthermore, the "options" offered to plaintiff in January 2000, after many months of harassment, did not constitute "appropriate remedial action," but rather "adverse employment action" and were retaliatory in nature. Finally, contrary to defendant's argument, plaintiff had no authority that would have allowed her to correct the situation on her own.

---

[33]   Plaintiff notes that, in arguing that plaintiff "unreasonably failed to use [her supervisory authority] to correct or avoid further harm," defendant confuses the standard for employer liability based on coworker harassment with the affirmative defense available to employers for supervisory harassment that does not result in tangible employment action. See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 763 (1998).

29

An employer is subject to liability for a hostile work environment created by a coworker if it "failed to provide an adequate avenue for complaints" or "knew of the harassment, or in the exercise of reasonable care should have known, yet failed to take appropriate remedial action." Dobrich v. General Dynamics Corp., 106 F.Supp.2d 386, 392 (D.Conn. 2000).

> Under Title VII, an employer need not have actual knowledge of the harassment; an employer is considered to have notice of sexual harassment if the employer – or any of its agents or supervisory employees – knew or should have known of the conduct. The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles. An official's knowledge will be imputed to an employer when: (A) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or (B) the official is charged with a duty to act on the knowledge and stop the harassment; or (C) the official is charged with a duty to inform the company of the harassment.

Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 63-64 (2d Cir. 1998). See also Dobrich v. General Dynamics Corp., 106 F.Supp.2d 386, 392 (D.Conn. 2000) ("The Second Circuit has held that knowledge of the harassment may include constructive notice (*i.e.*, that management should have known.)").

          *a.*    *Plaintiff's complaints and defendant's initial failure to respond*

DAI's sexual harassment policy states:

> If you believe you have been subjected to sexual harassment at work by anyone, including managers, co-workers, or any outside party dealing with the Company, you should first bring the problem to the attention of your Supervisor or Department Head. If you are uncomfortable raising your complaint with someone to whom you report, or if your complaint involves one of these individuals, then you are urged to bring it to the attention of some other management representative or directly to the Personnel Director.

Ex. 11 (1995 policy); see also Ex. 11 (2000 policy, with minor revisions). Consistent with the policy, plaintiff complained repeatedly to her supervisor and the Department Head, Linda Rizzo, about the harassing behavior over the course of many months. See e.g., Ex. 14; Ex. 1 (Perry) at 38 (plaintiff complained about harassment to Rizzo), 56-57 (plaintiff reported sexual comments

30

by Rich to Rizzo), 70-72 (plaintiff reported threatening argument with Rich to Human Resources and Rizzo), 84 (plaintiff reported Buccieri touching to Rizzo), 147-48 (plaintiff complained to Rizzo about harassment constantly); Ex. 2 (Rizzo) at 44 ("[plaintiff] came to me on a number of occasions and would say to me: They're vicious, they're out of control."), 54 (plaintiff came to me repeatedly to express worry about the circumstances in the aisle), 81 (plaintiff complained about Benedetto swearing in the aisle several times), 88 (admitting that plaintiff told her that the women in the aisle were making sexual remarks); Ex. 9 (Youngblood) at 14 (plaintiff "could have worn a path" to Rizzo's office and was "too busy complaining all the time"); Ex. 10 at ¶13, 16-19, 21-22, 29, 31-32. See also Ex. 2 (Rizzo) at 60 (someone may have told her that plaintiff was afraid of someone in her aisle), 84 (admitting that she heard a calendar was made of some employees and it was being passed around the office).

Despite the fact that the company's sexual harassment policy represents that "[a]ll complaints will be promptly investigated" [Ex. 11], each time plaintiff complained to Rizzo, she simply shook her head, told plaintiff to "relax," "ignore them," "document it," or to deal with the situation on her own.[34] Thus, management completely abdicated its responsibility to investigate

---

[34] See Ex. 2 (Rizzo) at 88 (admitting that when plaintiff reported to her that women in her aisle were making sexual remarks she told her to just go back and ignore them), 92 (admitting that she brushed off plaintiff's complaint by telling her that she looks for "picayune things" and that she should "relax and not let it get to her, . . ."); Ex. 1 (Perry) at 34, 38 (when plaintiff started having problems with women in aisle, Rizzo told her repeatedly "just document" it), 56 (when plaintiff told Rizzo about sexual comments by Rich, Rizzo "just shook her head"), 70 (after plaintiff reported threatening argument with Rich, Rizzo told her "[j]ust let it blow over, try to ignore it, try not to get yourself upset"), 84 (when plaintiff reported Buccieri's offensive touching, Rizzo responded that Buccieri's husband probably didn't give her enough attention at home and "just to ignore it and tell her to stop"), 147 (when plaintiff complained to Rizzo about lewd topics of conversation, Rizzo's response was "just try to calm down and ignore it, or say something to them, which [she] would do, and [they] would end up with another problem").

31

and address plaintiff's complaints. "Once an employer has knowledge of a [discriminatory] atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it." Snell v. Suffolk County, 782 F.2d 1094, 1104 (2d Cir. 1986). See also Dortz v. City of New York, 904 F.Supp. 127, 153 (S.D.N.Y. 1995) (employer "has an obligation to investigate whether acts conducive to the creation of an atmosphere of hostility did in fact occur and, if so, it must attempt to dispel the workplace hostility by taking prompt remedial steps.") (Citation and quotations omitted); Watts v. New York City Police Department, 724 F.Supp. 99, 107-108 (S.D.N.Y. 1989) ("once an employer learns of claims of discriminatory acts, it cannot rest idly on the hopes that such acts will not be repeated . . . Title VII simply does not permit an employer to 'stand by and allow an employee to be subjected to a course of [] harassment . . . by co-workers.'").[35]

DAI takes the position that they were unable to respond to plaintiff's complaints about her work environment because plaintiff did not provide them with enough specific information about what was occurring in the department. This position is legally and factually invalid. As indicated, DAI had an affirmative obligation to correct or at the very least investigate the harassment *even without additional specific information from plaintiff* because it had notice, based on plaintiff's complaints, that harassment was occurring. See Snell at 1104 (employer "who is aware of [] discriminatory atmosphere adversely affecting the emotional well-being and productivity of its employees" has duty to take reasonable steps to remedy situation); Dortz at

---

[35] Interestingly, defendant revised its sexual harassment policy to make its requirements less stringent in January 2000 at the same time that plaintiff was making increasingly vehement pleas to management to address the sexually harassing conduct in her aisle. Whereas the policy that had been adopted in 1995 stated that "[h]arassment in any form . . . is strictly against Company policy and *will* result in disciplinary action," the policy, as revised in January 2000, provided only that "[h]arassment . . . *may* result in disciplinary action . . . ." Ex. 11.

153; Watts at 107-8. See also, e.g., Knox v. State of Indiana, 93 F.3d 1327, 1335-36 (7th Cir. 1996) (employer was not excused from taking action in response to complaints of retaliatory harassment by employee on basis that employee did not provide names of alleged harassers because, *inter alia*, "the asserted reason for the delay – the need for names – played no role in the remedial action the employer took, in the form of a [] memorandum to all employees."). In fact, an employer has a duty to take action to correct a hostile work environment in some circumstances *even* when, unlike here, the victimized employee requests that her complaints be kept "confidential" and that no action be taken. See Torres v. Pisano, 116 F.3d 625, 635-38 (2d Cir. 1997) (noting that "[t]here is certainly a point at which harassment becomes so severe that a reasonable employer simply cannot stand by, even if requested to do so by a terrified employee").

Furthermore, contrary to defendant's position, as set forth above, plaintiff's complaints to management were adequate in that they included specific details of offensive behavior and the individuals involved. Rizzo did not request additional specific information, but rather side-stepped plaintiff's complaints by telling her to relax and ignore the behavior or document the wrongdoing, but then never asked plaintiff to see her documentation, leading plaintiff to believe that she was being brushed off, that her complaints to management were fruitless and that the misconduct was tolerated or even condoned by the company. See id.; Ex. 1 (Perry) at 38, 114-15, 153-54, 157-58, 202-3; Ex. 2 (Rizzo) at 46. Plaintiff was reluctant to continue complaining to management because, when she did, it only made her coworkers, who received no indication from management that their conduct would not be tolerated, more hostile and abusive toward her. See id. Where a plaintiff's failure to report specific instances of misconduct is "attributable to the conduct of the employer or its agent," the employer may be held liable for the hostile work

33

environment under Title VII. <u>Dobrich v. General Dynamics Corp.</u>, 106 F.Supp.2d 386, 392 (D.Conn. 2000); <u>Distasio v. Perkin Elmer Corporation</u>, 157 F.3d 55, 64 (2d Cir. 1998).[36]

        b.     *Defendant's failure to follow its own sexual harassment policy*

The fact that management tolerated or even condoned the behavior is further supported by the fact that *even after* plaintiff took two stress-related leaves of absence and resigned her employment because she could no longer work at DAI under the circumstances *and* provided the documentation she had kept at Rizzo's request – extensive contemporaneous notes including many specific details concerning the misconduct [see Ex. 14] – to DAI in November 2000 in connection with her administrative complaint, no investigation was undertaken and no disciplinary action taken, contrary to DAI's stated sexual harassment policy.  <u>See</u> Ex. 2 (Rizzo) at 73-76. <u>See also</u> <u>Dobrich</u> at 393 ("whether or not knowledge of the unreported incidents of sexual harassment can be imputed to [the employer] is ultimately a jury question. Just as the evidence of the unreported incidents of harassment must be considered by the jury on the issue of a hostile work environment, the circumstances surrounding the failure to report those incidents must also go to the jury on the question of whether liability for them can be imputed to [the employer].") (<u>Quoting</u> <u>Distasio</u> at 66).

While the existence of a sexual harassment policy is one factor to be considered in assessing the reasonableness of an employer's response, the existence of a policy alone will not insulate an employer from liability, particularly where management failed to follow the requirements of the policy.  <u>See</u> <u>Reed v. A.W. Lawrence & Co., Inc.</u>, 95 F.3d 1170, 1180 (2d Cir.

---

[36] On two occasions prior to the January 7, 2000 meeting with Wendy Kopazna, Rizzo also discouraged plaintiff from complaining to Human Resources about harassment by representing that she would handle the problem. <u>See</u> Ex. 1 (Perry) at 84, 122.

34

1996) (citing Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986)); Dortz v. City of New York, 904 F.Supp. 127, 154 (S.D.N.Y. 1995) (employer's response was not reasonable as a matter of law where, *inter alia*, defendant failed to follow its own policy requiring EEO officer to investigate all allegations of harassment). Here, the fact that defendant had a sexual harassment policy is not evidence of the reasonableness of its response because defendant did not follow its policy in that management failed to promptly investigate, or for that matter investigate at any time, plaintiff's complaints, and Rizzo failed to report plaintiff's complaints to Human Resources. See Ex. 11. Rather, no action was taken in response and plaintiff was told to simply "relax" and "ignore" the behavior and blamed for the situation in the aisle. When, as here, defendant does not follow the requirements of its own policy, the reasonableness of defendant's response presents a question of fact and summary judgment may not be granted. See Snell v. Suffolk County, 782 F.2d 1094, 1104-5 (2d Cir. 1986) (defendants failed to take reasonable steps to address racially hostile environment where "Sheriff did not adequately let it be known that racial slurs and the posting of derogatory materials would not be tolerated."); Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 64 (remanded for additional findings as to reasonableness of employer's response, noting that claims must be "evaluated in light of all the circumstances," including evidence tending to indicate that company at least tolerated their subordinate's unlawful harassing conduct); Baty v. Willamette Industries, 172 F.3d 1232, 1242 (10th Cir. 1999), *overruled on other grounds by* Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002) (evidence sufficient that employer response inadequate where "plaintiff presented evidence of defendant's lackadaisical attitude towards the harassment occurring within its walls, indicating that management condoned and even encouraged the creation of a hostile

35

work environment for plaintiff, especially given plaintiff's complaints about harassment by her supervisors").

### c. *Defendant's adverse and retaliatory response in January 2000*

Defendant argues that it took reasonable steps to address plaintiff's complaints after the January 7, 2000 meeting on the basis that, although it "could not accommodate [plaintiff's] demand that the four women be split up," it offered plaintiff "several options to address her complaints" including that she could remain in the same position and continue to attempt to quell her coworkers' misconduct, "transfer to another department," or resign as supervisor with no diminution in pay. Def.Mem. at 22. First, plaintiff disputes that these were the "options" presented to her. After making it clear that management would not consider relocating any of the women to other aisles on the basis that it wasn't "practical," plaintiff was told she could 1) remain in the same position under the same circumstances, 2) resign her supervisory position and return to the position of Coordinator in another aisle (and the company would possibly maintain the same pay) or 3) voluntarily terminate her employment. See Ex. 1 (Perry) at 167-68; Ex. 2 (Rizzo) at 123-24; E's. 19-20. Plaintiff was initially told she might be able to supervise a different aisle because another franchisee services supervisor was planning to retire shortly, but that offer was quickly rescinded on the basis that the woman had decided not to retire after all, and plaintiff was never offered another position at the company. See Ex. 1 (Perry) at 167-68; E's. 19-20. Second, each of the so-called "options" presented to plaintiff constituted "adverse employment action" and were retaliatory in nature because, as set forth fully in Section III.C. *infra*, they required plaintiff to continue to work in an increasingly hostile and abusive work environment, constituted a demotion, or a constructive discharge and, furthermore, did not

36

provide a reasonable response to plaintiff's complaints in that they failed to acknowledge or credit the harassment in any way, but rather placed the remedial burden on plaintiff, the victimized employee.

Several courts have found an employer's response inadequate under circumstances similar to those presented here. For example, in Dortz v. City of New York, 904 F.Supp. 127 (S.D.N.Y. 1995), the court denied summary judgment on the basis that a factfinder could reasonably conclude that the employer's response was unreasonable where: 1) the employer failed to follow its own policy which required that allegations of misconduct be investigated by an EEO officer, 2) the employer did not formally investigate the matter until 3 months after it had notice of the misconduct when plaintiff filed a formal charge with the EEOC, 3) the allegations were not adequately investigated prior to that time even though, unlike in the instant case, plaintiff's supervisor met with staff members about the allegations and spoke with the harasser, 4) the "remedial action" the employer took failed to stop the harassment, and 5) the employer did not evidence plaintiff's complaint in the harasser's personnel file or inform plaintiff that any disciplinary action would be taken, thus suggesting to plaintiff that her allegations had not been credited, noting that "an employee in Plaintiff's position might have been left feeling as though she were responsible for the poor working environment." See Dortz at 153-55. See also Riedinger v. D'Amicantino, 974 F.Supp. 322, 328 (S.D.N.Y. 1997) (employer's failure to investigate for more than four months after initial complaint, failure to question possible witnesses to the harassment, and absence of evidence that perpetrator was subjected to any discipline for his behavior provided "adequate basis for a jury to reasonably conclude that the defendants either provided no reasonable avenue for complaint or that they knew about the

37

discrimination to which plaintiff was subjected and acted inadequately to alleviate it."). Likewise, in Nichols v. Azteca Restaurant Enterprises, 256 F.3d 864 (9th Cir. 2001), where plaintiff was harassed by his coworkers and a supervisor because he was perceived as "effeminate and did not meet their views of a male stereotype," the court found that the employer's response to the hostile work environment was not reasonable even though plaintiff's manager made a "handful of spot checks" because the spot checks did not remedy the prior harassment and were not adequate to deter future harassment, and management "made no effort to investigate [plaintiff's] complaint," failed to discuss the allegations with the perpetrators, failed to "demand that the unwelcome conduct cease," failed to "threaten more serious discipline in the event the harassment continued," and rather "placed virtually all of its remedial burden on the victimized employee" by requiring that he report any *further* harassment even though he had already provided notice of the hostile work environment. Id. at 869, 876.[37]

---

[37]   DAI also argues that plaintiff failed to use the supervisory authority she had to correct the hostile work environment herself, suggesting that plaintiff had independent authority to issue verbal and written reprimands and poor performance evaluations and withhold monthly salary "bumps." See Def.Mem. at 23. As indicated at footnote 33 *supra*, in making the argument that plaintiff "failed to correct or avoid further harm," defendant confuses the standard for employer liability based on coworker harassment with the affirmative defense available to employers for supervisory harassment that does not result in tangible employment action. Furthermore, contrary to defendant's representation, plaintiff had no authority to give written warnings or poor performance evaluations to employees under her supervision absent Linda Rizzo's permission [see Ex. 1 (Perry) at 87-88, 156-57, 193-94; Def's 9(c)(1) SMT. at ¶21] and when plaintiff approached Rizzo about issuing warnings or negative evaluations, she was repeatedly instructed to ignore misconduct or to "think about it" in order to discourage a negative evaluation. See Ex. 1 (Perry) at 58, 156-57. For example, when plaintiff asked Rizzo for permission to discipline Buccieri for excessive absences and personal calls, Rizzo repeatedly refused but then finally issued the warning herself while plaintiff was out on disability leave due to the circumstances at work. See Ex. 1 (Perry) at 87-88, 157; Ex. 2 (Rizzo) 147-50; Ex. 21. Furthermore, as stated previously, plaintiff was reluctant to take any negative action against her coworkers because she did not have the support of management and knew that any disciplinary action taken by her would only result in further harassment or retaliation. See Ex. 1 (Perry) at 48,